IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| VIKI J. PIERCE | § | |
| **Plaintiff** | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  5:18-CV-138 |
| | § | JURY TRIAL DEMANDED |
| PATIENT SUPPORT SERVICES, INC., | § | |
| a wholly owned subsidiary of | § | |
| Lincare, Inc. | § | |
| **Defendant** | § | |

## RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

**COMES NOW**, Viki J. Pierce, Plaintiff herein, by and through undersigned counsel, and in accordance with the Local Rules of the Federal District Court and other applicable law, who hereby files and submits this Response to the Motion for Summary Judgment filed by Patient Support Services, Inc., Defendant herein, and in support thereof would respectfully show unto the Honorable Court as follows:

## I.
## INTRODUCTION

The main points to know about this case are that: (1) Pierce was treated differently and harassed at her job because she was perceived as having a disability and because of her age, which is over 40 years old; and (2) she suffered an adverse employment action for these reasons.  As a result of Defendant's actions, Pierce has brought federal claims against Defendant under the Americans with Disabilities Act and the Age Discrimination in Employment Act.  In defense of Pierce's termination, Defendant relies on a list of written reasons drummed up in an action plan several months before she was fired, despite two

1

stellar performance reviews, the last of which was only four months before the action plan was produced to Pierce. Nevertheless, Pierce is able to reasonably discredit the complaints set forth in the plan of action.

Defendant has filed a Motion for Summary Judgment and Brief in Support. In Defendant's Motion, Defendant claims its employees did nothing wrong. Pierce was simply fired because she was a bad employee. But there is another side to the story. Although Pierce's supervisor did not directly document her discrimination based on Pierce's age and disability, employers rarely do. This is a case of numerous comments and small acts that add up to a *prima facie* case of discrimination. Although Defendant offers so-called legitimate reasons for Pierce's termination, she is able to create genuine issues of material fact by rebutting each of Defendant's reasons as pretext and by showing she was fired due to her age and/or a perceived back disability. Thus, Defendant's Motion should be denied.

## II.
## RESPONSE TO STATEMENT OF ISSUES

Pursuant to Local Rule CV-7, Pierce offers the following responses to Defendant's Statement of the Issues:

1. Defendant is not entitled to summary judgment on Pierce's ADA claim because genuine issues of material fact exist as to each element of Pierce's claim.

2. Defendant is not entitled to summary judgment on Pierce's ADEA claim because genuine issues of material fact exist as to each element of Pierce's claim.

## III.
## OBJECTION TO LENGTH OF MOTION AND BRIEF IN SUPPORT

As an initial procedural matter, Pierce objects to Defendant filing a Motion over the page limit set forth by Local Rule CV-7(a)(1) without first obtaining leave of court. This rule

limits dispositive motions to thirty pages unless "leave of court is first obtained." Defendant has exceeded the page limit without first seeking leave, so the Defendant's Motion should not be considered because it violates Local Rule CV-7(a)(1).

## IV.
## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule CV-56(b), Pierce provides the following response to the statement of undisputed material facts set forth in Defendant's Motion.

**A.** **Incidents Where Pierce Felt She Was Being Treated as if She Had a Disability**

**1.** **Pierce's Back Condition**

Pierce has a birth defect called spondylolisthesis, which causes her vertebrae to be unstable and "go out" from time to time, Pierce, 25:23-26:9. She managed it by visits to a chiropractor who could put her vertebrae back in place. *Id.*, 67:17-68:1. She had never missed a day of work due to her back. *Id.*, 69:9-10. When her back was out, it would cause her to walk bent over, until she could get to a chiropractor. *Id.*, 67:17-68:1. It was an obvious issue and well known in the office because employees would see Pierce walk through the office time to time hunched over. *Id.*, 92:12-14, 93:5-7. Pierce did not hide her condition and would let people know she has a birth defect and she just needed to see a chiropractor to get it corrected. *Id.*, 93:7-12. If you saw her while her back was out, you would know something was wrong. *Id.*, 92:12-14.

Rhonda Bollman was Pierce's supervisor at Lincare for the relevant time period for this suit. *Id.*, 42:25-43:1. Bollman claims she did not know about Pierce's birth defect, but Pierce told her about the condition. *Id.*, 92:5-12. Pierce had conversations with Bollman about her back condition and her birth defect before Lincare bought PSSI. *Id.*, 92:5-12.

3

Accordingly, Bollman knew of Pierce's condition, and her comments regarding whether Pierce could physically do her job indicate Bollman regarded Pierce's back condition as a disability. *Id.*, 96:6-11.

### 2.   Remarks About Pierce's Physical Condition Within the Last Year of Her Employment

Pierce testified that Bollman and others made constant remarks about Pierce's physical ability to do her job. *Id.*, 96:6-11.  Pierce was asked on several different occasions whether she was physically able to do her job, despite not missing work because of her back. *Id.*, 64:16-21.   Any time she was having a back episode, Bollman and Christy Yarberry, a co-worker, would ask her if she could physically still do her job. *Id.*, 64:23-65:3.

There would be times it would take two to three days before Pierce could visit a chiropractor and, due to the pain, she would walk hunched over. *Id.*, 67:17-23. Just about every time her back went out, Bollman or Yarberry would ask Pierce if she was sure she could still physically do her job, *Id.*, 67:23-68:5, and sometimes they would make comments out of the blue. *Id.*, 90:23-91:1. Due to Bollman and Yarberry's comments, Pierce was made to feel substandard because of her back. *Id.,* 90:10-14, 90:17-19.

For example, Yarberry asked if she was sure she could still do her job with her back being the way it is and not being a spring chicken anymore. *Id.*, 68:8-69:14. Pierce did not think the comments were made out of concern for her health because her physical disability had never kept her from work. *Id.*, 69:3-10.   If she had missed work before due to her back, she could understand the comments and questions, but this never happened. *Id.*, 69:9-14. Further, Bollman and Yarberry's comments were not made in a compassionate

way, but in an adversarial atmosphere in a very derogatory and demeaning way. *Id.*, 69:15-70:19.

### 3.    Incident Regarding Time Clock and the Restroom

Pierce testified as to a specific instance in July 2017, about a month before she was fired, where Bollman publicly suggested Pierce was not physically capable of doing her job. On July 20, 2017, Pierce had an episode where her back went out. *Id.*, 96:14-16. Bollman verbally chewed her out for going to the restroom before she clocked out. *Id.*, 65:8-11. Pierce was waiting on her computer to pull up an application to clock out, and knew with her back situation causing her to walk slowly, she had better make it to the restroom right then or she was going to have an issue. *Id.*, 65:11-20.  So, she went to the restroom before clocking out, and when she came back Bollman was waiting at her door to reprimand her. *Id.*, 65:20-22.  Bollman wanted to know why she could not clock out before her restroom break. *Id.*, 65:24-66:1. Pierce felt Bollman was questioning whether she could physically do her job. *Id.*, 67:7-68:1.

### B.    Incidents of Age Discrimination

### 1.    Bollman Would Not Interview People Over 40 for Jobs

Pierce first noticed the bias against age in her employment in February 2016. *Id.*, 14:8-17. A job opening had come up in Pierce's department, and Bollman asked Pierce to review resumes and interview potential job candidates. *Id.*, 14:17-19.   There were two women out of the job candidates she remembers that were experienced and over the age of forty. *Id.*, 14:20-25. Pierce submitted the two candidates to Bollman, and Bollman told Pierce the two women would not be considered because they were over forty. *Id.*, 15:1-2. Bollman said Pierce needed to consider somebody younger, because sometimes people

over forty have health issues and so forth. *Id.*, 20:15-17. Instead, Pierce was told she had to hire a woman by the name of Page Vincent because she was younger. *Id.*, 15:2-4, 20:20-22.

### 2.   Defendant's Treatment of Margaret Barrett

Bollman treated another older employee, Margaret Barrett, poorly and pushed her to retire. Barrett was about to reach the age of sixty-five. Bollman and Yarberry told Pierce they hoped she retired soon. *Id.*, 72:18-74:2. Barrett was put under more pressure than others to make numbers. *Id.*, 100:10-12. Bollman went so far as to tell Pierce she should kind of encourage her to retire. *Id.*, 74:1-7. Barrett ended up retiring after Pierce left, *Id.*, 74:8-10, but she told Pierce she felt forced out of the company. *Id.*, 74:10-11. When referring to Barrett, Bollman said "older people need to pick up the pace." *Id.*, 119:22-120:9.

### 3.   Refusal to Consider Pierce for Another Job Position Due to Her Age

When Shelly Humes, a sales representative, decided to leave the company, her position was going to be open. Pierce considered interviewing for her position, but before she left, Humes told Pierce not to bother because Bollman had told Humes that Pierce was too old for the job. *Id.*, 75:4-9, 102:6-7, 102:23-103:12.

### 4.   Comments About Paula Thacker

Another employee, Paula Thacker, was over forty and treated similarly to Pierce. Thacker worked in the Arkansas Medicaid department. *Id.*, 101:12-15. Bollman made remarks about her that if it was not for her knowledge of Arkansas Medicaid, they would get rid of her too. *Id.*, 101:15-20.

### 5.   Discriminatory Atmosphere

Pierce testified as to the work environment and discriminatory atmosphere created

by Bollman and others regarding employees' age.  Pierce interviewed people four or five times over the years for positions in her department. *Id.*, 75:15-17.  Out of those four or five times, Bollman never interviewed anyone over forty years old. *Id.*, 77:7-12.  Starting in the last year of her employment, Pierce noticed Yarberry and Candace Oliver, another co-worker, make remarks about Pierce's age. *Id.*, 15:5-22, 16:12-20, 17:16-24.  For example, if Pierce forgot something, Yarberry and Oliver would say she was having a "senior moment." *Id.*, 18:4-10. People would make remarks like "older people need to pick up the pace." *Id.*, 95:19-21.  But Bollman was the main person who discriminated against her because of her age, *Id.*, 72:8-10, and Bollman terminated her because of it. *Id.*, 72:11-13. Many of Bollman's comments about her physical ability to continue to work related in Pierce's mind to both her age and perceived back disability. *Id.*, 64:9-11, 15-21.

## C.   Pretext Reasons Offered for Pierce's Termination

### 1.   Pierce Received All High Marks on the Only Two Performance Evaluations Conducted by Defendant

Bollman gave Pierce two performance evaluations after Lincare acquired PSSI. Bollman, 42:9-12.  On May 12, 2015, Pierce was given an commendable performance review by Bollman: she received a three out of four on all five categories — quantity, quality, work habits, attendance and compliance.  Pierce, 54:9-21; Pierce, Exhibit A6. Bollman noted she was a positive supervisor and helped others, Bollman, 44:2-12, and she was found to have complied with protocol timeframes, record documentation, education and evaluation, and infection control. Pierce, Exhibit A6.  Overall, it was a positive evaluation, by Bollman's own admission. Bollman, 45:7-9.

Then again, 18 months later, in November 2016 Pierce received another

commendable performance evaluation from Bollman. *Id.*, 45:10-17, 45:13-15, 46:13-16; Pierce, Exhibit A8. Although Bollman was required to comment on each of the five categories listed in the performance evaluation because she gave Pierce three out of four, Bollman failed to follow protocol. Bollman, 46:17-47:8.

### 2.      **Defendant's 60 Day Action Plan**

Four months later, on March 13, 2017, Defendant had a complete about-face with regard to Pierce. Bollman, the same person who issued Pierce's two prior commendable performance evaluations, issued Pierce a 60 Day Action Plan because of alleged serious concerns with Pierce's leadership style, ownership/accountability, and how she was communicating with her team. Pierce, Exhibit A12. After the 60 Day Action Plan was given to Pierce, she did not receive another review, warning or follow up. Bollman, 51:25-52:3, 56:10-18; Pierce, 89:23-25. Pierce rebuts and discredits all the complaints Bollman set forth in the 60 Day Action Plan, primarily because she was told when Lincare took on new business from competitors, McKesson and Centrad, beginning in 2016 and continuing until she was terminated, the new business was to take priority over all of her other job responsibilities including record compliance. Pierce, 36:23-38:12, 59:9-20, 61:15-24.

### 3.      **Pierce Discredited the Complaints Set Forth in the Action Plan**

Bollman set out several reasons for the action plan and Pierce rebutted and discredited the reasons set forth therein. The time clock issues all employees had. *Id.*, 80:20-23. The cell phone violations were due to other employees or sales representatives calling her on her cell phone, instead of her work phone, and therefore all the calls were work-related. *Id.*, 81:14-82:4. The failure to update the compliance binders was due to no documents being provided to her, or she was told to put it on hold until the new business

8

was taken care of.  *Id.*, 82:11-85:13. Pierce disputes whether the driver logs and the

monthly vehicle inspection logs were not kept up to date, because she kept up with those.

*Id.*, 86:24-87:3. The documents she was accused of keeping unsecure were locked in a

drawer in her desk because she was unsure of what to do with them or they were filed. *Id.*

87:4-88:12. She was told the lease plans were not important because the vehicles had

been returned.  *Id.*, 88:13-89:2. In short, none of the alleged defects and deficiencies

identified in the sixty day plan were in any way valid.

**4.    The Closer Pierce Got to 60 Years Old the More Comments She Heard and the More "Problems" Lincare Had with Her**

Pierce started with PSSI when she was 44 years old. Pierce, 94:25-95:1. She was

54 years old when Lincare acquired PSSI. *Id.*, 95:2-7. She was 59 when she filed her

EEOC charge. *Id.*, 94:20-24. She was getting dangerously close to her sixties and that did

not go over well at Lincare. *Id.*, 73:24-74:1  When it was around the time for her (Barrett) to

turn sixty-five, the comment was made several times they hoped she would retire *Id.*,

101:9-18.  Thacker was not quite as old as Barrett but she was older and there were

remarks made on several occasions that if it wasn't for her knowledge of Arkansas

Medicaid they would get rid of her too. *Id.*, 101:15-20

**V.
SUMMARY JUDGMENT STANDARD**

To prevail on its request for summary judgment, the Defendant must prove there are

no genuine issues about any material fact and that it is therefore entitled to judgment as a

matter of law. Fed. R. Civ. Pro. 56(c); *Baton Rouge Oil & Chem. Workers Un. v.*

*ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002). Generally, a defendant moving for

summary judgment may satisfy its burden in one of two ways: (1) by submitting admissible

evidence negating the existence of an essential element of the plaintiff's claim, *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *abrogated on other grounds, Little v. Liquid Air. Corp.*, 37 F.3d 1069 (5th Cir. 1994); or (2) by showing there is no evidence to support an essential element of the plaintiff's claim after a sufficient time for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).  A genuine fact issue is one that can be determined only by [a trier of fact] because it may be resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505 (1986).

**VI.**
**ARGUMENTS AND AUTHORITIES**

**A.**     **ADA and ADEA Claims and Pierce's Burden of Proof**

   **1.**     **ADA and ADEA Claims, Generally**

   Pierce has asserted claims against Defendant under both the ADA and the ADEA. The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying employment opportunities available to persons without disabilities.  *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 161 (5th Cir. 1996).  The ADA prohibits discrimination against a qualified individual because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999).

   Similarly, the ADEA was enacted by Congress to address discrimination, but the purpose of the ADEA is to address discrimination that stems from a perceived increase in age-based discrimination in the workplace.  29 U.S.C. § 621(a).  Broadly, its announced

purpose is to promote employment of older persons based on their ability and to prohibit arbitrary discrimination by employers based on age, 29 U.S.C. § 621(b); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S. Ct. 1307 (1996), as well as to force employers to stop using age as a proxy for other characteristics, like productivity. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11, 113 S. Ct. 1701 (1993). As "remedial and humanitarian legislation," the ADEA should be interpreted liberally to effectuate its goal of ending discrimination. *McConnell v. Thomson Newspapers, Inc.,* 802 F. Supp. 1484, 1505 (E.D. Tex. 1992).

## 2. The *McDonnell Douglas* Burden Shifting Framework Applies to ADA and ADEA Claims

Although neither the ADA nor the ADEA are part of Title VII, both anti-discrimination provisions are similar to the provisions of Title VII. Accordingly, courts have applied the same analytical framework used to analyze claims of racial discrimination, religious discrimination and the like to both ADA and ADEA claims. *E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (ADA claims); *Evans v. City of Houston*, 246 F.3d 344, 349 (5th Cir. 2001) (ADEA claims). This framework, the well-known "*McDonnell Douglas* framework," establishes "an allocation of the burden of production and an order for the presentation of proof in ... discriminatory treatment cases," *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742 (1993).

### a. Plaintiff's Initial Burden of a *Prima Facie* Case of Discrimination

The first step under the *McDonnell Douglas* framework is for the plaintiff to demonstrate a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000); Ross, 139 F.3d at 525.

Generally speaking, in terms of burden shifting, this requires the plaintiff to show she is within the class protected by the ADA or the ADEA, that she has suffered some kind of adverse employment decision, and that the adverse decision was motivated by discrimination. *Ross v. University of Tex. at San Antonio*, 139 F.3d 521, 525 (5th Cir. 1998). Although the exact elements of an ADA and ADEA claim are different, the plaintiff at this stage need only present a preponderance of evidence in support of the elements of each claim. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981). Under the *McDonnell Douglas* scheme, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254; *see also St. Mary's Honor Ctr.*, 509 U.S. at 506.

**b.     The Burden of Production Shifts Back to Defendant's Legitimate, Non-Discriminatory Explanation**

Once a plaintiff has made a prima facie case of discrimination an inference of discrimination arises, and the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the employment decision it made. *Reeves*, 530 U.S. at 142; *Ross*, 139 F.3d at 525. The evidence offered in support of this explanation must be both clear and reasonably specific. *Okoye v. University of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001); *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 675 (S.D. Tex. 2001).

**c.     If Defendant meets its Burden, then the Burden Shifts Back to Plaintiff to Prove that the Defendant's Explanation is Pretextual**

Assuming that this is the case, and assuming that this explanation is accepted as a legitimate, non-discriminatory explanation for a defendant's employment decision, then the burden once again shifts back to the plaintiff to show either that there is direct evidence

supporting the conclusion that the defendant acted with discriminatory intent, or that the defendant's non-discriminatory reason is not worthy of belief, and is instead only a pretext seeking to hide that it has discriminated. *Reeves*, 530 U.S. at 143; *Hall v. Gillman, Inc.*, 81 F.3d 35, 37 (5th Cir. 1996) (citing *Burdine*, 450 U.S. at 257)).  Put another way, the plaintiff must be afforded a "full and fair opportunity" to prove that the reason proffered by the defendant is not the "true reason for its employment decision," *Brown v. Bunge Corp.*, 207 F.3d 776, 781-82 (5th Cir. 2000), either through direct evidence of discriminatory intent or through circumstantial evidence showing that the defendant's proffered reason is untrue or pretextual.

### d.   Direct Evidence of Discrimination is Not Necessary

Because direct evidence of discrimination is often hard to come by, *see, e.g., United States Postal Svc. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478 (1983) (noting that "there will seldom be 'eyewitness' testimony as to the employer's mental processes"), most cases involving a claim of discrimination analyzed under the *McDonnell Douglas* framework involve indirect or circumstantial evidence that shows the employer's proffered explanation is false evidence that allows the trier of fact to "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose ..." *Reeves*, 530 U.S. at 147.  A trier of fact is permitted to conclude that if the employer's explanation is false the reason that is most likely to be true is that the employer was discriminating because "the employer is in the best position to put forth the actual reason for its decision," and so its failure to provide an honest explanation supports a finding of unlawful discrimination. *Id.* at 147-48.

**B.    Pierce Has Met Her *Prima Facie* Burden in Support of Both her ADA and ADEA Claims**

To make out a *prima facie* case, the plaintiff must prove the necessary elements "by a preponderance of the evidence." *Hamilton v. Grocers Supply Co., Inc.*, 986 F.2d 97, 98 (5th Cir. 1993); *see also Burdine*, 450 U.S. at 253. This initial burden is not "onerous." *Burdine*, 450 U.S. at 253. In determining summary judgment, a court must decide whether Pierce produced facts which, if believed, would lead a reasonable jury [or trier of fact] to conclude that it was more likely than not that Defendant terminated Pierce because of her disability or her age. *Atkinson v. Denton Pub. Co.*, 84 F.3d 144, 148 (5th Cir. 1996); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 n. 8 (5th Cir.1993).

**1.    Pierce's Evidence in Support of a *Prima Facie* Case of Discrimination Based on Her Disability**

The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability by, among other things, terminating the individual's employment. 42 U.S.C. 12112(a). To state a prima facie case under the ADA, the plaintiff must show: (1) she has a disability; (2) she was qualified for the job; and (3) she was subject to an adverse employment decision on account of her disability. *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016); *Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998); *Jackson v. Texas Forest Svc.*, 194 F. Supp. 2d 566, 571 (E.D. Tex. 2001). In the context of the ADA, the term "disability" is a term of art, and a disability exists when: (1) a person has a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (2) a person has record of having such an impairment; or (3) a person is perceived as having such an impairment. 42 U.S.C. § 12101(2); *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001); *Hamilton*, 136 F.3d at

14

1050. Even Defendant admits in its Motion (Motion at 27), that an ADA claim may be supported with evidence of a perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12101(3)(A); "Under the 'regarded as' prong, the disability status of the plaintiff turns not on the plaintiff's physical condition, but rather on how the plaintiff was perceived and treated by those alleged to have taken discriminatory action." *Bennett v. Calabrian Chemicals Corp.*, 324 F. Supp. 2d 815, 833 (E.D. Tex. 2004*), aff'd*, 126 Fed. Appx. 171 (5th Cir. 2005).

As an initial matter, Defendant claims Pierce failed to exhaust her administrative remedies regarding her ADA claim. Motion at 26. Pierce filed a timely complaint with the Equal Employment Opportunity Commission. On August 10, 2018, the EEOC issued Pierce a Notice of Right to Sue letter. Plaintiff's Amended Complaint, Exhibit A. Although Pierce did not check the disability box, she noted in her EEOC charge that she was harassed and ridiculed because of her back issues. Pierce, Exhibit A1. She believes she signed the EEOC charge but she dealt with the EEOC over the phone quite a bit and she does not remember. Pierce, 11:24-12:7; Pierce, Exhibit A1. The facts are true and correct under penalty of perjury. *Id.*, 12:24-13:4. Thus, her ADA claim is within the scope of the EEOC investigation which could reasonably have grown out of the administrative charge.

Substantively, Defendant challenges Pierce's evidence in support of the first and third element of her ADA claim. Motion at 27-29. Pierce was treated by Defendant as if she had a disability because of her back condition. Pierce, 95:8-13. Pierce does have a birth defect called spondylolisthesis, a condition causing her vertebrae to be unstable and her back to go out from time to time. *Id.*, 25:23-26:9. When her back was out, it would cause her to walk bent over until she could visit a chiropractor to put her vertebrae back in

15

place. *Id.*, 67:17-68:1. Pierce had conversations with Bollman about her back condition and her birth defect before Lincare bought PSSI. *Id.* 92:5-12. It was an obvious issue and well known in the office because employees would see Pierce walk through the office time to time hunched over. *Id.*, 92:12-14, 93:5-7. Pierce did not hide her condition and would let people know she has a birth defect and she just needed to see a chiropractor to get it corrected. *Id.*, 93:7-12. If you saw her while her back was out, you would know something was wrong. *Id.*, 92:12-14. Bollman claims she did not know about her birth defect, but Pierce remembers telling Bollman about it. *Id.* 92:5-12. Thus, Bollman did know of her condition and her comments regarding whether Pierce could physically do her job indicate Bollman regarded her back condition as a disability. *Id.*, 96:6-11. As an argument to negate the "regarded as" element, Defendant brings up Bollman could not have seen Pierce as having a disability because she had her own back issues. Motion at 28. Whether or not Bollman had a back issue caused by sweeping out her garage is irrelevant as to whether Bollman saw Pierce with a disability due to her birth defect. Accordingly, a fact issue exists as to whether Defendant regarded Pierce as having a disability.

Next, Defendant next claims Pierce cannot meet her burden to show she was terminated because of her perceived disability. Defendant claims she only has evidence of two occasions where her ability to do her work was questioned. Motion at 29. However, Pierce testified that Bollman and others made constant remarks about Pierce's physical ability to do her job. *Id.*, 96:6-11. Pierce was asked on several different occasions whether she was physically able to do her job despite not missing work because of her back. *Id.*, 64:16-21. Any time she was having a back episode, Bollman and Yarberry would ask her if she could physically still do her job. *Id.*, 64:23-65:3.

16

In fact, Pierce testified as to a specific instance a month before she was fired where Bollman publicly suggested Pierce was physically not capable of doing her job. On July 20, 2017, Pierce had an episode where her back went out. *Id.*, 96:14-16. Bollman verbally chewed her out for going to the restroom before she clocked out. *Id.*, 65:8-11. Pierce was waiting on her computer to pull up an application to clock out and knew with her back situation causing her to walk slowly, she had better make it to the restroom right then or she was going to have an issue. *Id.*, 65:11-20. So, she went to the restroom before clocking out and when she came back, Bollman was waiting at her door to reprimand her. *Id.*, 65:20-22. Bollman wanted to know why she could not clock out before her restroom break. *Id.*, 65:24-66:1. Pierce felt Bollman was questioning whether she could physically do her job. *Id.*, 67:7-68:1. There would be times it would take two to three days before Pierce could visit a chiropractor and due to the pain, Pierce would have to walk hunched over. *Id.*, 67:17-23. Just about every time her back went out Bollman or Yarberry would ask Pierce if she was sure she could still physically do her job, *Id.*, 67:23-68:5, and sometimes they would make comments out of the blue. *Id.*, 90:23-91:1. Due to Bollman and Yarberry's comments, Pierce was made to feel substandard because of her back. *Id.*, 90:10-14, 90:17-19.

For example, Yarberry asked if she was sure she could still do her job with her back being the way it is and not being a spring chicken anymore. *Id.*, 68:8-69:14. Pierce did not think the comments were made out of concern for her health because her physical disability had never kept her from work. *Id.,* 69:3-10. If she had missed work before due to her back, she could understand the comments and questions. *Id.*, 69:11-14. But she had never missed a day of work due to her back. *Id.*, 69:9-10. Further, Bollman and Yarberry's

17

comments were not made in a compassionate way but in an adversarial atmosphere in a very derogatory and demeaning way. *Id.*, 69:15-70:19.   Again, a fact issue exists as to whether Pierce was fired because of a perceived disability.

### 2.   Pierce's Evidence in Support of a *Prima Facie* Case of Discrimination Based on Her Age

To establish a *prima facie* case of age discrimination, "a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010).

Here, it is undisputed that Pierce was terminated, was qualified for her position and was in a protected class of over forty when she was terminated.   The only element Defendant challenges is whether Pierce has evidence to support she was discharged because of her age. Motion at 18.  Pierce outlined four different situations where age was a discriminating factor in working for Defendant.

Pierce first noticed the bias against age in her employment in February 2016. Pierce, 14:8-17. A job opening had come up in Pierce's department and Bollman asked Pierce to review resumes and interview potential job candidates. *Id.*, 14:17-19.   There were two women out of the job candidates she remembers that were experienced and over the age of forty. *Id.*, 14:20-25.  Pierce submitted the two candidates to Bollman, and Bollman told Pierce that the two women would not be considered because they were over forty. *Id.*, 15:1-2. Bollman said Pierce needed to consider somebody younger because sometimes people over forty have health issues and so forth. *Id.*, 20:15-17.  Instead,

18

Pierce was told she had to hire a woman by the name of Page Vincent, because she was younger. *Id.*, 15:2-4, 20:20-22.

Second, Bollman treated another older employee, Margaret Barrett, poorly and pushed her to retire. Barrett was about to reach the age of sixty-five and Bollman and Yarberry told Pierce they hoped she retired soon. *Id.*, 72:18-74:2. Barrett was put under more pressure than others to make numbers. *Id.*, 100:10-12. Bollman went so far as to tell Pierce she should kind of encourage her to retire. *Id.* 74:1-6. Barrett ended up retiring in December after Pierce left, *Id.*, 74:8-10, but she told Pierce she felt forced out of the company. *Id.*, 74:10-11. When referring to Barrett, Bollman said "older people need to pick up the pace." *Id.*, 119:22-120:9.

Third, when Shelly Humes, a sales representative, decided to leave the company, her position was going to be open. Pierce considered interviewing for her position, but before she left, Humes told Pierce not to bother because Bollman had told Humes Pierce was too old for the job. *Id.*, 75:4-9, 102:6-7, 102:23-103:12.

Fourth, another employee, Paula Thacker, was over forty and treated similarly to Pierce. Thacker worked in the Arkansas Medicaid department. *Id.*, 101:12-15. Bollman made remarks about her that if it was not for her knowledge of Arkansas Medicaid, they would get rid of her, too. *Id.*, 101:15-20.

Additionally, Pierce testified as to the work environment and discriminatory atmosphere created by Bollman and others regarding employees' age. Pierce interviewed people four or five times over the year for position in her department. *Id.*, 75:15-17. Out of those four or five times. Bollman never interviewed anyone over forty years old. *Id.*, 77:7-12. Starting in the last year of her employment, she noticed Yarberry and Oliver make

remarks about Pierce's age. *Id.*, 15:5-22, 16:12-20, 17:16-24. For example, if Pierce forgot

something, Yarberry and Oliver would say she was having a "senior moment." *Id.*, 18:4-10.

People would make remarks like "older people need to pick up the pace." *Id.*, 95:19-21.

But Bollman was the main person who discriminated against her because of her age, *Id.*,

72:8-10, and Bollman terminated her because of it. *Id.*, 72:11-13. Many of Bollman's

comments about her physical ability to continue to work related in Pierce's mind to both her

age and perceived back disability. *Id.*, 64:9-11, 15-21.

Defendant claims that Pierce's discrimination theory is based on nothing more than

comments related to age that do not meet the Fifth Circuit's test to qualify as evidence of

discrimination.   Motion at 19.   Further, Defendant claims Pierce's evidence of job

candidates being discriminated against because of age was not sufficient alone to show

discrimination in her case. Motion at 20. Defendant also argues the remarks about Barrett

retiring are not sufficient by themselves indicative of discriminatory intent, and attacks

Pierce's testimony regarding Humes as hearsay and illogical, Motion at 21-22, and finally,

comments by co-workers also do not rise to the level of actionable discrimination. Motion

at 22. In all, Defendant spends four pages of its Motion going over four different categories

of evidence that, taken alone, the Fifth Circuit has stated do not rise to the level of

discriminatory intent. Further, Defendant did not even address the Paula Thacker facts or

the time clock/restroom incident a month before Pierce's termination which could fall into

both age and disability discrimination.  Defendant is intentionally focusing on the trees,

hoping the Court will overlook the forest.  If all of the incidents addressed by Defendant are

taken together along with the incident Defendant completely failed to address involving

Paula Thacker and the stray remarks and co-worker comments within the year before

Pierce was fired, a *prima facie* case exists to support Pierce's age was a substantial factor in Pierce's termination.

**C.**   **Pierce Has Sufficient Evidence to Raise Genuine Issues of Material Fact as to Pretext**

As shown above, Pierce has sufficient evidence to raise fact issues regarding the elements of both her ADA and ADEA claims.  Under *McDonnell Douglas*, the burden now shifts to Defendant to produce evidence of a legitimate, nondiscriminatory reason for terminating Pierce.  In Defendant's Motion, it sets forth its so-called legitimate reasons for Pierce's termination, Motion at 23, which, for purposes of this Response, Pierce will assume are sufficient.  Thus, the burden shifts back to Pierce to show the reasons proffered by Defendant are nothing more than pretext.

A plaintiff may show pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.' *Jackson*, 602 F.3d at 378–79.  The inquiry is focused on whether the Defendant's explanation, accurate or not, is "the real reason" for firing Pierce. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637–38 (5th Cir. 2011).  Pierce must produce evidence, viewed in the light most favorable to her, that would permit a jury, or trier of fact, to believe that Defendant's proffered reasons for firing her were not its true reason but simply pretext for a discriminatory reason. *Id.* Such rebuttal evidence, combined with the *prima facie* case, will suffice to create a genuine issue of material fact such that summary judgment is inappropriate. *Id.*; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005).

Here, Defendant's proffered non-discriminatory reasons for terminating Pierce are nothing more than pretext. Bollman gave Pierce two performance evaluations after Lincare

acquired PSSI. Bollman, 42:9-12. On May 12, 2015, Pierce was given an commendable performance review by Bollman. She received three out of four on all five categories, quantity, quality, work habits, attendance and compliance in the evaluation. Pierce, 54:9-21; Pierce, Exhibit A6. Bollman noted she was a positive supervisor and helped others. Bollman, 44:2-12, and she was found to have complied with protocol timeframes, record documentation, education and evaluation, and infection control. Pierce, Exhibit A6. Overall, it was a positive evaluation, by Bollman's own admission. Bollman, 45:7-9.

Then again, 18 months later, in November 2016 Pierce received another commendable performance evaluation from Bollman. *Id.*, 45:10-17, 45:13-15, 46:13-16; Pierce, Exhibit A8. Although Bollman was required to comment on each of the five categories listed in the performance evaluation because she gave Pierce three out of four, Bollman failed to follow protocol. Bollman, 46:17-47:8.

Four months later, on March 13, 2017, Defendant took a complete about face with regard to Pierce. Bollman, the same person who issued Pierce's two prior outstanding performance evaluations, issued Pierce a 60 Day Action Plan because of alleged serious concerns with Pierce's leadership style, ownership/accountability, and how she was communicating with her team. Pierce, Exhibit A12. After the 60 Day Action Plan was given to Pierce, she did not receive another review, warning or follow up. Bollman, 51:25-52:3, 56:10-18, Pierce, 89:23-25. Pierce rebuts and discredits all the complaints Bollman set forth in the 60 Day Action Plan primarily because she was told when Lincare took on new business from competitors, McKesson and Centrad, beginning in 2016 and continuing until she was terminated, the new business was to take priority over all of her other job responsibilities including record compliance. Pierce, 36:24-38:12, 59:9-20, 61:15-24.

Bollman set out several reasons for the action plan and Pierce rebutted and discredited the reasons set forth therein. The time clock issues all employees had. Pierce, 80:20-23. The cell phone violations were due to other employees or sales representatives calling her on her cell phone instead of her work phone. *Id.*, 81:14-82:4. The failure to update the compliance binders was due to no documents being provided to her or she was told to put it on hold until the new business was taken care of. *Id.*, 82:11-85:13. She disputes whether the driver logs and the monthly vehicle inspection logs were not kept up to date because she kept up with those. *Id.*, 86:24-87:3. The documents she was accused of keeping unsecure were locked in a drawer in her desk because she was unsure of what to do with them or filed. *Id.*, 87:4-88:12. She was told the lease plans were not important because the vehicles had been returned. *Id.*, 88:13-89:2.

Defendant argues that because Bollman is over 40 years old, she could not have an animus toward older employees as she is one herself. Motion at 25. But there is a big difference in Bollman's age of 45 and Pierce's age of 59. Thus, it is disingenuous for Defendant to argue just because both Bollman and Pierce were over forty and in the same protected class when Bollman was fired, means that Bollman could not discriminate against Pierce. For example, both a 41-year-old supervisor and a 65-year-old employee are in the same protected class for age discrimination but it does not mean the 41-year-old supervisor could and would not discriminate against the 65-year-old employee based on age. Pierce has at the least raised fact issues with regard to the pretext reasons Defendant gave for terminating her, and thus, Defendant's request for summary judgment on Pierce's ADA and ADEA claims should be denied.

## VII.
## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Pierce prays that the Defendant's

Motion for Summary Judgment be in all respects **DENIED**, for the reasons set forth herein.

Strictly in the alternative, Pierce prays that if the Court finds Defendant's Motion is

meritorious in part that it be **DENIED** with respect to those issues on which the Court finds

Defendant has not proven itself entitled to judgment as a matter of law.

Pierce prays for such other and further relief, general or special, in law or in equity,

to which she may prove herself to be justly entitled.

Respectfully submitted,

R. David Freeze
CRISP & FREEZE
1825 Moores Lane
Texarkana, Texas 75503
Telephone: 903-831-4004
Facsimile: 903-831-4006
Email: dfreeze@crispfreeze.com

*/s/ R. David Freeze*

By:   _____

R. David Freeze
Texas State Bar No. 07434500
Attorney for Plaintiff Viki J. Pierce

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing
Response has been sent to David M. Kalteux, and Rachel Z. Ullrich c/o FordHarrison LLP,
1601 Elm Street, Suite 4450, Dallas, Texas 75201, through the Court=s CM/ECF system on
this, the 27th day of November, 2019.

*/s/ R. David Freeze*

_____

R. David Freeze

24