IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **VIKI J. PIERCE** | § | |
| **V.** | § | **No.  5:18CV138-RWS-CMC** |
| **PATIENT SUPPORT SERVICES, INC.,** | § | |
| **a wholly owned subsidiary of Lincare** | | |
| **Inc.** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. The following motion is before the Court:

**Defendant's Motion for Summary Judgment (Docket Entry # 23).**

The Court, having reviewed the relevant briefing, recommends the motion be **GRANTED**.  The Court further recommends the above-entitled and numbered cause of action be **DISMISSED WITH PREJUDICE.**

## I.  BACKGROUND

Viki J. Pierce ("Plaintiff"), a former employee of Patient Support Services, Inc., a wholly owned subsidiary of Lincare Inc. ("PSSI" or "Defendant"), presents claims for disability discrimination under the Americans with Disabilities Act of 1990 ("ADA") and for age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA").  According to the Second Amended Complaint ("SAC"), Plaintiff was an accounting manager for Defendant from approximately March 2003 until March 2014, when Lincare Inc. ("Lincare") acquired

Defendant.  Docket Entry # 19, ¶ 9. Plaintiff alleges she was employed by Defendant as Center Operations Manager from March 2014 until her employment was terminated on August 21, 2017. *Id.* Plaintiff was fifty-nine years old when her employment was terminated.  *Id*., ¶ 10.

Plaintiff alleges Defendant violated the ADEA and ADA by terminating her employment because of her back condition and age. Plaintiff requests the Court (1) enter declaratory judgment against Defendant and in favor of Plaintiff recognizing Defendant violated Plaintiff's rights; (2) award Plaintiff past lost wages, including lost fringe benefits and back pay which resulted from illegal discrimination; (3) award Plaintiff future lost wages, including lost fringe benefits and future pay, together with any future benefits that would have otherwise occurred had it not been for the illegal discrimination; (4) award Plaintiff compensatory and punitive damages; (5) award Plaintiff costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and (6) enter an order restraining Defendant from any retaliation against Plaintiff for participating in any manner in this litigation.  *Id*., ¶ 25.

## II.  SUMMARY JUDGMENT MOTION

Defendant moves for summary judgment on Plaintiff's claims, first asserting the ADEA claim fails because Plaintiff cannot show she was replaced by someone substantially younger or otherwise discharged because of her age.  Docket Entry # 23 at p. 18. According to Defendant, Plaintiff's discrimination theory is comprised primarily of stray comments related to her age, which Defendant asserts were not proximate in time or related to Plaintiff's actual termination.  *Id.* at pp. 19-22. Defendant further asserts it had legitimate, nondiscriminatory business reasons for its termination decision, including the following: failure to follow workplace instructions regarding time management; failure to meet daily goals including communications; failure to manage compliance

binders; failure to train and manage employees; and failure to demonstrate leadership and accountability for her actions, including the use of the office phone for personal business. *Id.* at p. 23. Defendant argues Plaintiff cannot show pretext or "but for" causation. *Id.* at pp. 23-26.

Regarding Plaintiff's ADA claim, Defendant maintains Plaintiff failed to exhaust her administrative remedies. *Id.* at pp. 26-27. Although Plaintiff mentioned disability discrimination in her intake questionnaire, Defendant asserts Plaintiff did not check the disability box on her administrative charge. *Id.* at p. 26. Nor did she state her employment was terminated because of an alleged disability, according to Defendant. Defendant further asserts, in a footnote, that Plaintiff's charge of discrimination is unsworn. *Id.* at p. 26, n. 22.

Alternatively, Defendant argues Plaintiff cannot establish her *prima facie* case of disability discrimination because she cannot prove she was disabled within the meaning of the ADA. *Id.* at pp. 27-29. Even if Plaintiff could establish a *prima facie* case, Defendant contends her claim still fails because Plaintiff cannot show Defendant's legitimate, nondiscriminatory reasons for her termination are pretext. *Id.* at pp. 29-31.

In response, Plaintiff states this "is a case of numerous comments and small acts that add up to a *prima facie* case of discrimination." Docket Entry # 24 at p. 2. According to Plaintiff, although Defendant "offers so-called legitimate reasons for [her] termination, she is able to create genuine issues of material fact by rebutting each of Defendant's reasons as pretext and by showing she was fired due to her age and/or a perceived back disability." *Id.* Regarding the exhaustion issue, Plaintiff explains that although she did not check the disability box, "she noted in her EEOC charge that she was harassed and ridiculed because of her back issues." *Id.* at p. 15. Plaintiff "believes she signed the EEOC charge, but [notes] she dealt with the EEOC over the phone quite a bit and she does not

remember." *Id.* Plaintiff asserts the "facts are true and correct under penalty of perjury," and "her ADA claim is within the scope of the EEOC investigation which could reasonably have grown out of the administrative charge." *Id.*

## III.  LEGAL STANDARDS

### A.     Summary judgment standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325;

4

*Byers v. Dallas Morning News*, *Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex*, 477 U.S. at 323. To meet its burden, the moving party must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Vallecillo v. Wells Fargo Bank, N.A.*, No. 5:16-CV-935-DAE, 2018 WL 3603120, at *2 (W.D. Tex. May 15, 2018) (citing *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990)).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor . . . unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 Fed. Appx. 335, 338 (5th Cir. 2004). Rather, the court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

All facts and inferences drawn from those facts must be viewed in the light favorable to the party resisting the motion for summary judgment. *Mission Pharmacal Co. v. Virtus Pharm., LLC*, 23 F. Supp. 3d 748, 756 (W.D. Tex. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 97 (5th Cir. 1993)).  "The court need consider only the cited materials, but it may consider other materials in the record."  *Mission Pharmacal*, 23 F. Supp. 3d at 756–57 (quoting FED. R. CIV. P. 56(c)(3)).

**B.     Summary judgment burdens in employment discrimination context**

"A distinct subset of analytical principles applies when a motion for summary judgment is filed in an employment discrimination or retaliation case." *Keel v. Wal-Mart Stores, Inc.*, No. 1:11-CV-248, 2012 WL 3263575, at *6 (E.D. Tex. July 17, 2012), *report and recommendation adopted*, No. 1:11-CV-248, 2012 WL 3262882 (E.D. Tex. Aug. 9, 2012), *aff'd*, 544 Fed. Appx. 468 (5th Cir. 2013). A plaintiff-employee may prove discrimination or retaliation either by direct or circumstantial evidence. *See McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir.2007). "Direct evidence is evidence that, if believed, proves the fact of discriminatory [or retaliatory] animus without inference or presumption." *West v. Nabors Drilling, USA, Inc.,* 330 F.3d 379, 384 n. 3 (5th Cir.2003) (internal quotations omitted).

When a plaintiff-employee relies on circumstantial evidence, courts within the Fifth Circuit apply a modified *McDonnell Douglas* framework that involves shifting burdens of production to determine whether an action warrants a plenary trial. *Keel*, 2012 WL 3263575, at *7 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); also citing *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (describing the Fifth Circuit's modified *McDonnell Douglas* approach to employment discrimination cases where a

mixed-motive analysis might apply)). Under the *McDonnell Douglas* framework, the plaintiff employee has the initial burden to make a *prima facie* showing of discrimination or retaliation. *McInnis v. Alamo Cmty. College Dist.*, 207 F.3d 276, 279–80 (5th Cir. 2000). To satisfy this burden, the plaintiff need only make a very minimal showing. *Keel*, 2012 WL 3263575, at *7 (citations omitted).

Once the plaintiff-employee makes this showing, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for the adverse employment action. *Id.* (citing *McInnis*, 207 F.3d at 280). "The defendant may meet this burden by presenting evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08, (U.S. 1993)) (internal quotations omitted). This burden does not involve a credibility assessment. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000).

If the employer meets its burden, "'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non.*'" *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816, 831 (E.D. Tex. 2014), *aff'd sub nom. Brooks v. Firestone Polymers, L.L.C.*, 640 Fed. Appx. 393 (5th Cir. 2016) (quoting *Reeves,* 530 U.S. at 142–43 (quoting *Hicks,* 509 U.S. at 510)). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Brooks*, 70 F. Supp. 3d at 831 (quoting *Reeves,* 530 U.S. at 143 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981))) (other citations omitted).

In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue material fact either (1) not true, but a mere pretext for unlawful discrimination or retaliation (pretext alternative); or (2) true, but only one of the reasons for its conduct, and another motivating factor is the plaintiff-employee's protected characteristic (mixed-motive[s] alternative).  *Keel*, 2012 WL 3263575, at *7 (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)); *see also Brooks*, 70 F. Supp. 3d at 831–32. The plaintiff–employee satisfies this burden if a rational fact finder could find in his favor. *Keel*, 2012 WL 3263575, at *7 (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012) (citing *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342–43 (5th Cir. 2002))).

Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case'" that properly may be considered by the court when ruling on a motion for summary judgment. *Brooks*, 70 F. Supp. 3d at 832–33 (quoting *Price v. Fed. Express Corp.,* 283 F.3d 715, 720 (5th Cir.2002) (quoting *Reeves,* 530 U.S. at 148–49)).

## IV. SUMMARY JUDGMENT EVIDENCE

Defendant submitted the following evidence in support of its motion: (1) Excerpts of oral deposition of Viki J. Pierce ("Pl. Dep."), with twelve attached exhibits; (2) Excerpts of oral deposition of Rhonda Bollman ("Bollman Dep."); and (3) Declaration of Rhonda Bollman ("Bollman Decl."). In support of her response to the motion, Plaintiff attached excerpts of the depositions of Plaintiff and Bollman. On January 13, 2020, the Court granted Defendant's motion

8

for leave to file a supplement to the summary judgment record by including the composite exhibit to Rhonda Bollman's declaration attached as Exhibit A to Docket Entry # 28.  Docket Entry # 30. The Court informed the parties that Plaintiff would have seven days in which to respond to the supplemental exhibit, after which time the Court would consider the motion for summary judgment ripe for consideration. No response to Defendant's supplemental exhibit has been filed.

Taken together, the parties' evidence establishes the following.

• **Plaintiff's back condition**

Plaintiff's date of birth is March 1958.  Pl. Dep. at 10:22-23.  Since she was twelve years old, Plaintiff has had a birth defect called Spondylolisthesis. *Id.* at 25:23-26:9. She has an unstable vertebrae that moves and causes her back to "go out" from time to time, which requires Plaintiff to visit a chiropractor. *Id.* When Plaintiff's back went out, it would cause her to walk bent over until the chiropractor put it back in place. *Id*. at 67:17-18.

**Plaintiff's employment with PSSI**

PSSI is an in-home care center that provides enteral therapy and durable medical equipment to patients for their enteral needs.  Bollman Decl., ¶ 2. Plaintiff began her employment with PSSI in March 2003, working in accounts payable, at almost 45 years old. Pl. Dep. at 29:24-30:9; 94:25-95:1. Plaintiff was promoted to an accounting supervisor position until March 2014. *Id.* at 30:13-18. PSSI was owned by independent owners during this time period. Bollman Dep. at 14:8-12.

• **Lincare acquired PSSI**

Lincare Inc. ("Lincare") acquired PSSI around March 2014. Pl. Dep. at 32:1-6. New ownership brought a number of changes to PSSI, including an enhanced focus on performance goals

9

and metrics, as Lincare is very numbers and quota driven.  *Id*. at 73:10-19; Bollman Decl., ¶ 28. For

example, Lincare wants each employee to have a certain amount of numbers of tasks performed (*i.e.*,

fifteen patients processed per day), and an employee's performance is based on all of these numbers.

Pl. Dep. at 72:21-73:14; Bollman Decl., ¶ 23. This number-driven approach is the same for all

employees. Pl. Dep. at 73:15-16.

•       **Plaintiff's employment after Lincare's acquisition of PSSI**

As a result of Lincare's acquisition of PSSI in 2014, Plaintiff's accounting supervisor job was

eliminated because Lincare performed its accounting functions out of its corporate office in Florida.

*Id*. at 31:2-7. Rather than terminating her employment, Plaintiff was given the title of Operations

Manager. *Id*. at 29:24-30:7; 31:8-9. Plaintiff's new position was on the patient processing side of the

business, a part of the business she had not dealt with. *Id*. at 56:1-7. None of Plaintiff's job duties

from her old position transitioned to her new role. *Id*. at 56:8-10. Plaintiff was now required to be

a part of a team and the operations process. Bollman Decl., ¶ 6.

As Operations Manager, Plaintiff reported to a new supervisor, Center Manager, Rhonda

Bollman. Pl. Dep. at 42:22-43:1. Bollman began her employment at PSSI as a Customer Service

Supervisor in 2004, and became the Center Manager in March 2014 when Lincare acquired PSSI.[1]

Bollman Decl., ¶ 3. Although they had previously worked in different departments, Plaintiff had

known and worked with Bollman for about ten years. *Id*., ¶ 4. Plaintiff and Bollman had an amicable

relationship before Bollman became her supervisor. Pl. Dep. at 43:17-19. They ate lunch together.

*Id*. at 43:20-21; Bollman Dep. at 36:16-18.

---

[1] Bollman stayed in the Center Manager position until November 2018, when she was promoted to District Area Manager. Bollman Decl., ¶ 3.

Bollman had no negative feelings towards Plaintiff. Bollman Dep. at 36:18-19. Soon after the transition, Bollman gave Plaintiff a $5 gift card and flowers with a note that said "thanks for stepping up to the plate and accepting the challenge around here! Your efforts are noticed." Pl. Dep. at 115:15-116:18. Plaintiff testified Bollman was sometimes a "very good" supervisor to work for, but at other times "very frustrating and very aggravating" because Plaintiff did not know what Bollman's expectations were. *Id*. at 48:19-49:25 (further stating there was a lack of training about Plaintiff's new responsibilities and Plaintiff had to "dig out" different aspects of the position for herself). Bollman is currently forty-seven years old and was over forty years old when she became Plaintiff's supervisor. Bollman Dep. at 14:2-3.

The goal of Operations Manager was to support the Center Manager and to be involved in all aspects of the operations. Bollman Decl., ¶ 6. Initially, Plaintiff's job duties consisted primarily of chart compliance. Pl. Dep. at 35:23-36:13. Plaintiff was also responsible for maintaining and regularly updating a number of different compliance binders kept by PSSI. *Id*. at 41:11-19. Plaintiff agreed compliance is important, noting Lincare takes it "very seriously." *Id*. at 41:20-21. Plaintiff's job duties also included supervising two front desk employees who did ticket confirmations, making sure they were keeping up with their tickets and meeting their performance goals. *Id*. at 41:1-10; Bollman Decl., ¶ 7. Before PSSI could bill a patient, anytime it made a delivery, it had to confirm the supplies were delivered either in the form of the signed delivery ticket by the patient or confirmation from the carrier that delivered it. Pl. Dep. at 39:11-21. This was known as a "ticket confirmation." Bollman Decl., ¶ 7. Plaintiff also assisted in interviewing but not hiring. Bollman Dep. at 52:25-53:5.

Plaintiff underwent a variety of training from Lincare and PSSI for her Operations Manager

11

role. *See* Pl. Ex. 5. Plaintiff received training from Lincare on feeding pumps and computer compliance training. Pl. Dep. at 51:1-10.

- **May 12, 2015 performance evaluation**

On May 12, 2015, Bollman issued Plaintiff's performance evaluation where she received a 3.0 out of 4.0 in all four measurable categories (quantity, quality, work habits, and attendance with a "meets expectations" in compliance) and an overall rating of 3 out of 4.[2] *Id.* at 54:9-21, Ex. 6. Plaintiff had no issues with this evaluation. *Id.* at 54:22-24. Bollman noted Plaintiff was a positive supervisor and helped others, and Plaintiff was found to have complied with protocol timeframes, record documentation, education and evaluation, and infection control. Pl. Ex. 6. On her self-evaluation, Plaintiff stated she had to "learn a totally new part of the business in that [she] had not been a part of patient care protocol." Pl. Ex. 7. Plaintiff further stated she had increased her skills by learning the things necessary to qualify a patient, the paperwork Lincare must have and "many other things that are needed to be able to provide care to [the] patients." *Id.*

- **June 3, 2015 verbal warning**

On June 3, 2015, Plaintiff was issued a verbal warning for failing to meet performance goals. Pl. Dep. at 62:8-15, Exh. 10. Plaintiff and her direct reports failed to meet the requisite number of ticket confirmations for May and had 90 less than the previous month. Pl. Ex. 10. Bollman had previously discussed with Plaintiff the importance of managing her staff to ensure performance goals are met. *Id.* The written document memorializing the conversation indicated failure to improve

_____

[2] PSSI has two parts to its performance evaluations – the supervisor evaluation and a self-evaluation. Pl. Dep. at 55:8-13.

12

performance could result in further disciplinary action, up to and including termination. *Id.* Plaintiff did not contest the verbal warning.[3] Pl. Dep. at 63:10-13, Ex. 10.

• **Plaintiff's job duties shift in 2016**

In 2016, PSSI acquired a lot of new business from a competitor, McKesson. Bollman Decl., ¶ 8. After the acquisition of this business, Kristy Yarberry, LaCandace Oliver, and Shawn Walker, and Plaintiff were all put in one office and their major responsibility was processing the new nursing homes' patients. *Id.*; Pl. Dep. at 47:6-20. Plaintiff was involved in the front end of the process, which consisted primarily of obtaining the documents and information necessary from each new facility on each patient so PSSI could determine if the patient had insurance or qualified for Medicare (known as "qualifying the patient"). Bollman Decl., ¶ 9. Once the patient was qualified, PSSI would register the patients and provide services and products to new patients – completing the front end of the process. Pl. Dep. at 37:1-6; 38:9-10; Bollman Decl., ¶ 9.

The back end of the process is where PSSI would ship out the products or render the services to the patients and then bill and collect for those products and services. Bollman Decl., ¶ 10. If there was an issue on the front end, it would significantly delay and cause issues on the back end, which in turn prevented PSSI from getting paid for its products and services. *Id.* Thus, it was imperative that the front end was performed accurately and efficiently. *Id.* In addition to her new patient processing duties, Plaintiff remained responsible for her compliance and supervisory duties. *Id.* The new business and the compliance binders were both high priority duties and, as a manager, Plaintiff

---

[3] The Company's Problem Resolution Procedure allows an employee to formally dispute the disciplinary action and any information contained therein. Pl. Dep. at 63:10-13, Exh. 10. Plaintiff testified she did not take the verbal warning through the problem resolution procedure because she felt it was a futile effort; others had attempted to do so and nothing had been done. Pl. Dep. at 63:14-64:2.

was expected to prioritize her duties and use time management to stay on top of both of them or ask for help if needed. Bollman Dep. at 57:7-20.  That "ramp up period" with the increased business from the competitor was still going on when Plaintiff was terminated.  Pl. Dep. at 38:4-12.

- **November 4, 2016 performance evaluation**

On November 4, 2016, Plaintiff received her 2016 performance evaluation. Pl. Dep. at 58:17-20, Ex. 8. Bollman rated Plaintiff a 3.0 out of 4.0. Pl. Exh. 8. Plaintiff had no issues with this performance evaluation. Pl. Dep. at 59:3-4.

- **Alleged performance deficiencies**

Jane Carlson was a respiratory therapist and sales manager. Bollman Dep. at 67:3-4. Carlson was working at the Texarkana facility to help with all the new business. *Id*. at 67:9-11. Around March 2017, Carlson reported a number of Plaintiff's performance deficiencies. Bollman Decl., ¶ 11. Carlson discovered the compliance binders were not being maintained properly. *Id*.; Bollman Dep. at 67:14-20. Carlson also pointed out Plaintiff was making mistakes in her patient processing duties, like inputting information incorrectly or untimely, which would delay the patient processing process. Bollman Decl., ¶ 11. Plaintiff's performance errors were causing delays and otherwise adversely affecting the sales team's sales, and thus, PSSI's bottom line. *Id.*

Bollman had given Plaintiff the "benefit of the doubt for the first couple of years based on her transition to a new position in a new department in the hopes that she would adapt to the position eventually." *Id*., ¶ 12. According to Bollman, "it was becoming clear that [Plaintiff] was struggling to complete the job duties required of her position." *Id*. After Carlson's complaints, Bollman began to keep a closer eye on Plaintiff, and she started formally documenting her performance issues. Id.

14

- **March 13, 2017 action plan**

On March 13, 2017, Plaintiff was placed on a 60 day action plan.[4] *Id.*, ¶ 13; Pl. Dep. at 79:15-17. According to the action plan, Plaintiff's "actions and behaviors [were] not supporting the goals and conditions of the Texarkana, TX, center and Lincare," and Plaintiff was not demonstrating a leadership role even though she had been Operations Supervisor since March 2014.  Pl. Ex. 12. Bollman stated she had "discovered multiple serious concerns with [Plaintiff's] leadership style, ownership/accountability and how [Plaintiff was] communicating to [her] team." *Id.*  It had also been reported that she had demonstrated "highly unprofessional behavior including improper clocking and timekeeping." *Id.* The action plan listed the following specific performance deficiencies: (1) improper clocking and timekeeping (specifically February 6, 2017 which had been previously addressed verbally); (2) inappropriate use of cell phone; (3) failure to maintain and update compliance binders; (4) failure to maintain accurate drivers logs; (5) failure to maintain and update daily and monthly vehicle inspections records; (6) concerns with Plaintiff's use of the shred bin and drawers. *Id.* Plaintiff had been verbally counseled by Bollman about many of these performance deficiencies before being given the action plan. Bollman Decl., ¶ 13. Plaintiff did not contest this action plan.[5]

---

[4] Bollman testified the company's progressive discipline policy allows verbal warning, written warning, an action plan as an option, a final written warning as another option, and termination.  Bollman Dep. at 51:18-24. Bollman stated she chose to do the action plan as the best course of action because it is more detailed than a final written warning. *Id.* at 52:1-24.

[5] Plaintiff did not submit her action plan through the problem resolution procedure or complain to anyone at Lincare that she thought the action plan was unfair in any way. Pl. Dep. at 89:3-10. Plaintiff did not complain to the district area manager or anyone at Human Resources about the action plan. *Id.* at 89:11-18.

a. Improper Clocking and Timekeeping. Bollman testified Plaintiff was not always honest with her about timekeeping. Bollman Dep. at 36:20-25. An employee clocks in and out through her computer time program. *Id*. at 37:4-6. According to Bollman, Plaintiff would not clock out when she left and then when she came back she would clock in, which would put her as out and then clock back in thirty minutes later so it showed she had a thirty-minute lunch break instead of an hour lunch break. *Id*. at 37:6-11. Bollman discussed this with Plaintiff several times prior to the action plan. *Id*. at 37:12-13. The failure to accurately report time away for lunch was unacceptable. Pl. Ex. 12.

Plaintiff testified any failure to clock in was an accident, noting it was not uncommon to walk in from lunch and have the "telephone ringing off the hook, a nursing home calling you and sometimes with the time clock you would clock in and out and it would fail to record your punches and it was a random issue." Pl. Dep. at 81:3-9.

b. Inappropriate Use of Cell Phone. According to Plaintiff, all of the supervisors received communication on their cell phones from "company reps, sales reps out in the field." Pl. Dep. at 81:15-20. Plaintiff admitted she also took personal calls on her cell phone during work time, but she stated her personal phone calls were "very minor compared to some of the other supervisors." *Id*. at 82:5-10. Company policy requires employees to make personal calls on breaks unless it is a true emergency. Pl. Ex. 12.

c. Failure to Maintain and Update Compliance Binders. Plaintiff failed to maintain at least six different compliance binders. Pl. Exh. 12. The Patient Satisfaction Survey Binder had not been updated since February 2015. *Id.* The Non-FDA Customer Complaints Binder only had one entry for 2016. *Id.* The Chart Audit Binder was missing data from 2014-2017. *Id.* The Infection Control

16

Binder had never been used. *Id.* The Quality Assurance Binder only had one entry in 2016. *Id.* The Safety Meetings Binder was missing the May, June, and November 2016 meeting reports. *Id.* Plaintiff acknowledged it was her responsibility to keep the compliance binders up to date, but stated she was told the "McKesson infusion" was priority and the binders "took second place" and were to be done when Plaintiff had "spare time." Pl. Dep. at 84:7-11; *see also id.* at 61:19-24; *see also id.* at 85:12-13 ("Rhonda [Bollman] would tell me, leave the books alone, you can stay over to do it.").

Plaintiff did not dispute that many of the compliance binders were missing reports. *Id.* at 61:25-62:2; 85:4-5. However, she testified there were reasons why they were not up-to-date. *Id.* at 62:3-5. According to Plaintiff, she was not given any patient surveys or customer complaints to put into the binders, and a lot of the chart audit binder information was lost when she had to abruptly move into another office "when the McKesson thing started." *Id.* at 82:11-83:12.

d. <u>Failure to Maintain Accurate Drivers Logs</u>. Drivers Logs were missing dates and data, and the last record was from February 2, 2017. Pl. Exh. 12. The Drivers Logs should be updated daily, and it was unacceptable that Plaintiff was missing over one month of records. Bollman Decl., ¶ 14. During her deposition, Plaintiff testified she entered the driver logs on a weekly basis.  Pl. Dep. at 85:14-19.

e. <u>Failure to Maintain and Update Vehicle Inspections Records</u>. For the daily records, at least thirteen days of records were unaccounted for in 2017, and the last record was filed February 16, 2017. Pl. Exh. 12. For the monthly records, the last records were from August 2016. *Id.* During her deposition, Plaintiff acknowledged some of the safety meeting reports were missing, but she disputed that any daily vehicle inspections were missing, stating she "stayed on [her] driver weekly to get

[her] those inspections." Pl. Dep. at 85:22-86:15.  However, Plaintiff did not believe she "got the driver logs or daily vehicle inspection binder" after the meeting and "said, no, you are wrong, they are all up-to-date." *Id.* at 86:19-23.

f. <u>Shred Bin and Drawer Concerns</u>. The action plan detailed concerns with Plaintiff's document retention practices, including unsecured pre-acquisition documents not archived, unsecured personnel records, undeposited cash and checks in her office, unopened letters concerning the company vehicles' registrations, and unopened letters with checks in them in the shred bin. Pl. Exh. 12. Plaintiff admitted there were unopened checks in her office that she should have shredded, but she explained she instead marked them void and placed them in her top drawer. Pl. Dep. at 87:4-11. Plaintiff admitted that there were cash pay tickets and cash found in her office totaling just under $500 and dating back to August 2016.  According to Plaintiff, she had not had time to get to the bank and get them deposited, but they were "under lock and key." *Id.* at 88:5-12. It is undisputed there were also unopened letters from LeasePlan in Plaintiff's office. *Id.* at 88:13-18. However, Plaintiff testified she was told the lease plans were not important because the vehicles had been returned. *Id.* at 88:13-89:2.

- **Alleged performance deficiencies continued**

According to Bollman, Plaintiff's performance did not improve after the action plan.  Rather, her performance worsened. Bollman Decl., ¶ 15. Plaintiff testified Bollman did not speak to her again about how she was performing on the action plan. *Id.* at 89:19-25. Bollman testified she followed up with Plaintiff on her action plan. Bollman Dep. at 56:1-6. Bollman stated they did weekly checkpoints where they checked the binders and tried to get everything caught up and spoke

18

about her other performance deficiencies. *Id.* at 56:7-16. Bollman documented a number of Plaintiff's specific performance deficiencies committed after the action plan.[6] Bollman Decl., ¶ 15. These deficiencies are contained in Composite Exh. A and are as follows:

a. <u>Failing to Respond to E-mails</u>. On July 18, 2017, Bollman asked Plaintiff whether she was handling a patient account and Plaintiff never responded. Bollman Decl., ¶ 16, Exh. A-4. On July 26, Bollman e-mailed Plaintiff asking about an account and Plaintiff did not respond until Bollman made a second request for the information two days later. Bollman Decl., ¶ 16, Exh. A-19. On July 28, Bollman e-mailed Plaintiff inquiring about several new patient accounts and Plaintiff never responded. Bollman Decl. ¶ 16, Exh. A-24. On August 10 and 11, Yarberry e-mailed Plaintiff asking where a patient was in the processing order; Plaintiff did not respond to either e-mail. Bollman Dep. at ¶ 16, Exhs. A-36 and A-37. According to Bollman, Plaintiff's failure to either respond or answer the specific question asked by her supervisor or coworkers in e-mails was unprofessional and frustrated the patient processing process. Bollman Decl., ¶ 16. Plaintiff's lack of responsiveness continued up until her termination. *See* Bollman Decl., ¶ 17, Exhs. A-39, A-40, A-44.

b. <u>Failing to Properly Enter Patient Information</u>. Bollman states Plaintiff committed numerous errors entering patient information.  Bollman Decl., ¶ 17. Plaintiff's mistakes included entering inaccurate information, entering the information untimely, or failing to enter the patient information into the system whatsoever. *Id*. For example, on July 21, 2017, Plaintiff failed to input necessary information in a patient's chart before processing the patient, which required another

---

[6] Bollman began documenting Plaintiff's performance deficiencies in July 2017 when it was evident her performance was not improving after the issuance of the action plan. Bollman Decl, ¶ 17. Many of the same issues noted below had been happening before the action plan was issued. *Id.*

employee to stop the process and input the data. Bollman Decl., ¶ 17, Exh. A-7. On July 24, Plaintiff failed to process patient information in the correct order. Bollman Decl., ¶ 17, Exh. A-13. On July 25, Plaintiff processed a patient but failed to input most of the necessary information. Bollman Decl., ¶ 17, Exh. A-15. On July 28, Plaintiff inputted inaccurate and incomplete information for two patients. Bollman Decl., ¶ 17, Exhs. A-20 and A-23. On August 15, Plaintiff entered incorrect information when processing a patient which caused supplies to be shipped to a patient before the patient's insurance was verified. Bollman Decl., ¶ 17, Exh. A-46. These mistakes were significant because they disrupted the back end and PSSI's ability to bill the patients and get paid. Bollman Decl., ¶ 17.

c. <u>Plaintiff Failed to Perform Requested Tasks</u>. On July 15, 2017, Bollman had an employee come in on overtime to process accounts Plaintiff was asked to process but never did. Bollman Decl., ¶ 18, Exh. A-1. On July 17, Bollman asked Plaintiff to cover a conference call on July 19, but Plaintiff did not cover the call. Bollman Decl., ¶ 18, Exh. A-8. On August 14, Bollman asked Plaintiff to address an issue with a customer service representative, but Plaintiff never responded to the e-mail or addressed the issue. Bollman Decl., ¶ 18, Exh. A-43. On August 17, Bollman instructed Plaintiff to enter patient information a certain way for a specific patient and Plaintiff failed to respond to Bollman or follow her instructions. Bollman Decl., ¶ 18, Exh. A-47.

d. <u>Plaintiff Failed to Be an Effective Supervisor</u>. Plaintiff failed to properly train or provide support to her direct reports. Bollman Decl. ¶ 19. Several employees reported to Bollman that Plaintiff did not provide them with support and that they had to be trained and supported by the other managers. *Id.* Bollman eventually had to move Plaintiff's direct reports to a different supervisor because she was not providing proper supervision. *Id.*

e. <u>Plaintiff's Use of Company Phone for Personal Calls</u>. Initially Plaintiff used her cell phone for personal calls.  Bollman Decl., ¶ 20. However, after the action plan, Bollman noticed Plaintiff stopped using her cell phone and began making personal calls on the company phone. *Id*. Bollman reviewed her company phone records for May 2017 and the records showed 86+ personal calls for that month during working hours. Bollman Decl., ¶ 20, Exh. A-56. According to Bollman, using the company phone for personal use during work hours is not allowed except for an emergency. Bollman Decl., ¶ 20.

• **Informal counseling**

Bollman counseled Plaintiff about the performance deficiencies listed in her action plan and above.  Bollman Decl., ¶ 21. For example, on July 24, 2017, Bollman counseled Plaintiff about her role with PSSI in an effort to improve her performance. Bollman Decl., ¶ 21, Exh. A-11(A). Bollman explained what was expected of her as Operations Manager and that many of her job duties had been taken away because of her inability to perform the tasks.  *Id.* In the counseling, Bollman noted how Plaintiff used to manage ticket confirmations but this was taken away because she did a poor job and gave no direction to her team.  *Id.* Plaintiff had direct reports at one point, but they were outperforming her and did not feel supported by Plaintiff, so they were taken away. *Id.*

Plaintiff responded that she felt she did not have experience in operations that others had, to which Bollman replied that she had been in this position for years now and had been given plenty of opportunity to develop her position. *Id.* On August 2, 2017, Bollman counseled Plaintiff for failing to follow company protocol when identifying new patients and for failing to respond to her emails. Bollman Decl., ¶ 22, Exh. A-31. Bollman documented this in a write-up after the meeting.

*Id.*

• **Events leading up to August 21, 2017 termination and termination decision**

Plaintiff's goal was fifteen new patient accounts processed each day, but she consistently failed to meet this goal. Bollman Decl., ¶ 23. On August 14, 2017, Bollman notified Plaintiff there had been a significant drop in the number of patients billed the previous month and that she needed to meet the minimum of fifteen patients processed per day. Bollman Decl., ¶ 23, Exh. A-41.

On August 18, 2017, Bollman found many of the compliance binders were still not being maintained and several were missing entirely. Bollman Decl., ¶ 24, Exh. A-40. Bollman wrote a statement documenting this.  *Id.*

Plaintiff's performance deficiencies were "significantly interrupting the patient processing process on a daily basis." Bollman Decl., ¶ 25. Bollman communicated with Rob Dellaposta and Paula Adams in HR about terminating Plaintiff. Bollman Dep. at 14:17-18 & 16:17-20. Bollman discussed in detail Plaintiff's progress and what steps to take.  *Id.* at 70:1-7. Plaintiff's age or back problems were not discussed. *Id.* at 70:6-11. While she did consult with Dellaposta and Adams, Bollman ultimately made the decision to terminate Plaintiff's employment herself. *Id.* at 18:7-8.Neither Kristy Yarberry nor LaCandace Oliver were involved in the decision to termination Plaintiff's employment.  Bollman Decl., ¶ 26.

On August, 21, 2017, Plaintiff was terminated by PSSI for the following performance reasons: failure to follow workplace instructions regarding time management, failure to meet daily goals including communications, failure to manage compliance binders, failure to train and manage employees, and failure to demonstrate leadership and accountability for her actions, including the

use of the office phone for personal business. Pl. Dep. at 78:4-9, Exh. 11. Plaintiff never complained

to anyone at PSSI that she thought her termination was because of her age or alleged disability. Pl.

Dep. at 79:4-10.  Bollman denied that Plaintiff's age or her health had anything to do with Plaintiff's

termination. Bollman Dep. at 83:23- 84:7.

- **PSSI did not replace Plaintiff**

PSSI did not replace Plaintiff. Bollman Dep. at 29:24-25. The Operations Manager position

is still vacant. Bollman Decl., ¶ 26. Bollman absorbed a majority of Plaintiff's job duties herself,

with the rest going to Yarberry, Oliver, and other employees already working for PSSI. Bollman

Dep. at 30:1-3; 32:3-5. However, a new hire could have done something Plaintiff did at one point.

*Id.* at 30:12-25.

- **Plaintiff's EEOC Charge**

After Plaintiff was terminated, she filed a charge of discrimination with the EEOC. Pl. Dep.

at 11:8-14, Exh. 1. Plaintiff checked the boxes for discrimination based on retaliation and age, but

she did not check the box for disability. Plaintiff does not recall ever checking the box for disability

discrimination on her charge. Pl. Dep. at 13:9-11. The Charge's statement of particulars states "I

believe I was discriminated against because of my age (60), in violation of the Age Discrimination

in Employment Act of 1967, and that I was retaliated against." Pl. Exh. 1. Plaintiff's only mention

of an alleged disability in her charge was that "on July 20, 2017, I was ridiculed publicly by Rhonda

Bollman, Center Manager, for not clocking out before going to the restroom because of my back

issues." *See id.* The earliest date of alleged discrimination is July 20, 2017.  Pl. Dep. at 13:20-22.

• **Plaintiff's allegations of age discrimination**

Plaintiff believes Bollman discriminated against her because of her age by terminating her employment and by her attitude towards Plaintiff. Pl. Dep. at 72:8-17. Plaintiff does not believe Bollman discriminated against her because of age in any other way. *Id*. at 72:8-17. According to Plaintiff, there were days in the office when everything Plaintiff said was "called into question or everything [she] said was disputed or [she] got hateful and hurtful comments." *Id*. at 69:19-25. Bollman made some of the hateful and hurtful comments, and Yarberry made some of them. *Id*. at 70:3-6.  Regarding the alleged comments made by Bollman, Plaintiff stated it "wasn't so much exactly what she said as how she said." *Id*. at 70:7-11. By the end of her employment, it was obvious to Plaintiff she was not wanted there. *Id*. at 70:1-2.

Plaintiff testified that Bollman did not make direct comments about Plaintiff's age. *Id.* at 68:15-22. Bollman made "very subtle" references to age like "all of us are getting older" and "with age comes certain problems." *Id.* at 68:15-22. According to Plaintiff, there were also "insinuations along with [comments like] was [Plaintiff] physically able to do [her] job." *Id.* at 68:17-18. Plaintiff testified why she believes she was discriminated against because of her age as follows:

a. <u>Interviews</u>. Plaintiff claims in February 2016, she was given a stack of resumes and had to interview candidates for a reception position.[7] Pl. Dep. at 14:12-15:4. There were two candidates that were over forty years old, and both of them had receptionist experience which Plaintiff felt

---

[7] Plaintiff did not have hiring responsibilities. Bollman Dep. at 52:25-53:3. Bollman would do the hiring but on occasion Plaintiff would look at resumes and make recommendations based on interviews. Pl. Dep. at 75:10-14. Plaintiff would do this for the two employees who sat out front when those positions opened up. *Id.* at 75:23-76:5. Plaintiff only did interviews a couple of times. Bollman Dep. at 53:14-15. Plaintiff only made recommendations to hire about four to five people for PSSI. Pl. Dep. at 75:10-14.

would have been good. *Id.* Plaintiff claims Bollman told her she could not consider the two candidates for the position because they were over forty years old. *Id.* Bollman denies ever having any conversation with Plaintiff or saying anything to her about the age range of people she could interview.  Bollman Dep. at 53:19-25. Ultimately, PSSI hired a younger candidate who had been recommended by another PSSI employee, and Plaintiff acknowledged in her deposition she ended up being a strong performer. Pl. Dep. at 21:19-23.

b. Shelly Humes. Humes was a sales representative who was older than Plaintiff. Bollman Decl., ¶ 27; Pl. Dep. at 75:8-9. Plaintiff testified Humes, when she was getting ready to leave the company, told Plaintiff not to bother applying for her sales rep job because Bollman had told Humes Plaintiff was too old to be a sales representative. Pl. Dep. at 75:1-9; *see also id.* at 103:8-12. Humes did not report to Bollman. Bollman Dep. at 81:12-14. Bollman denies that this conversation ever occurred. *Id.* at 81:24-82:9. Humes was part of the sales team which was not a part of what Bollman managed in the operations. *Id.* at 81:18-20. Bollman was not responsible for hiring sales representatives. Bollman Decl., ¶ 27.

c. Margaret Barrett and Paula Thacker. Plaintiff believes age factored into her termination because of the way another employee, Margaret Barrett, was treated. Pl. Dep. at 72:18-74:2. Barrett was approximately sixty-five years old and had been with the company for a long time. *Id.* Plaintiff acknowledged Barrett was not very skilled and was a slow performer and could be "very frustrating."[8] *Id.* Plaintiff alleges Bollman and Yarberry stated they hoped she would retire when she turned sixty-five and that Plaintiff should "kind of encourage her to retire." *Id.* at 73:24-74:4. Barrett

---

[8] At one point, Barrett worked underneath Plaintiff. Pl. Dep. at 72:18-74:2. Plaintiff admitted Barrett often had trouble meeting her performance metrics. *Id.* Plaintiff testified she was told constantly to tell Barrett "she needed to get her numbers up." *Id.* at 73:21-24.

did eventually retire on her own volition. Bollman Dep. at 70:21-22.  Barrett ended up retiring after Plaintiff left, but Plaintiff testified Barrett told Plaintiff she felt forced out of the company. Pl. Dep. at 74:8-11. Plaintiff stated she began to see an "age bias" with the "company as a whole." *Id.* at 74:24-25.

According to Plaintiff, another employee, Paula Thacker, was over forty and treated similarly to Plaintiff. Paula Thacker worked in the Arkansas Medicaid department. *Id*. at 101:12-15. Plaintiff testified Bollman made remarks about Paula on several occasions that if it was not for her knowledge of Arkansas Medicaid, "they would get rid of her too." *ld*. at 101:15-20.

d. Comments. Plaintiff testified Bollman did not make any direct comments about Plaintiff's age to her during her employment with PSSI. Pl. Dep. at 15:9-19 (testifying Kristy Yarberry and Candace Oliver made several "little snips and barbs" in the Plaintiff's last year of employment with no recollection of anyone else making remarks about Plaintiff being old). According to Plaintiff, Bollman made "very subtle" insinuations, not necessarily direct comments about her age. *Id.* at 68:15-22. Specifically, Plaintiff alleges that during a conversation with Bollman about Barrett's performance, Bollman made a comment that "older people need to pick up the pace," which indicated to Plaintiff "a definite bias against older employees." *Id.* at 120:2-13.

According to her declaration, Bollman frequently directs employees – of all ages – to "pick up the pace" when performing tasks like ticket confirmations or patient processing because there were daily goals that needed to be met and PSSI was a numbers-driven business now that it was owned by Lincare. Bollman Decl., ¶ 28. Bollman denies she made any comments about anyone's age and their ability to do the job. Bollman Dep. at 84:11-13.

26

As noted above, Plaintiff claims Yarberry and Oliver made "snips and barbs" about her age during the last year of Plaintiff's employment. Pl. Dep. at 15:5-19. During conversations between Plaintiff and Yarberry, Yarberry would make "snippets" from time to time describing things as "older" or that is "what older people do" when discussing things that pertained more to older generations. *Id.* at 16:12-20. For example, Plaintiff and Yarberry were having a conversation about cars because Yarberry was in the market to purchase a new vehicle. *Id.* at 15:23-16:7. Plaintiff had recently purchased a Buick Enclave and recommended the car to Yarberry. *Id.* Yarberry stated that she only ever saw old people driving those cars. *Id.* Plaintiff looked at her and said "excuse me" to which Yarberry laughed and said "well, older people." *Id.* Yarberry and Oliver sometimes stated that if Plaintiff was forgetful, that she had a "senior moment." *Id.* at 18:4-10. Yarberry stated to Plaintiff that she was not a "spring chicken" anymore. *Id.* at 68:8-14. Neither Yarberry nor Oliver were involved in the decision to terminate. Bollman Decl., ¶ 26. Yarberry and Oliver were Plaintiff's peers. Pl. Dep. at 17:8-12.

Bollman has hired and terminated employees of all ages during her tenure as Center Manager for PSSI. Bollman Dep. at 23:1-25; 27:25-28:24; 29:10-36:7. Bollman terminated two manager-level employees during her employment with PSSI after the Lincare acquisition – Plaintiff and Wendy Childress. *Id.* at 27:25-28:7. Childress was a Center Manager in Green Valley, Missouri, approximately the same age as Bollman. *Id.* at 28:8-24. Childress's replacement was about the same age as Bollman was also. *Id.* at 29:10-21. Bollman has also hired Jan Terrel as a manager (over forty years old). *Id.* at 35:16-22. Bollman was over forty years old when she terminated Plaintiff. Bollman Decl., ¶ 26.

•    **Plaintiff's allegations of disability discrimination**

Plaintiff testified she did not have a disability but believes she was treated as if she had a disability. Pl. Dep. at 95:8-13. Plaintiff claims people treated her as if she had a disability because she was constantly being asked if she could still physically perform her job. *Id.* at 95:14-18. Plaintiff felt like the verbal warning she received was "an insinuation that because of [her] age [she] was slower." *Id.* at 63:10-64:14.  According to Plaintiff, both before and after the verbal warning, she was asked on several different occasions (by Bollman and Yarberry) if she felt like she was still physically able to do her job, even though she had not missed any work because of her back or age. *Id.* at 64:16-65:6. Plaintiff did not think the comments were made out of concern for her health because her physical disability had never kept her from work . *Id.* at 69:3-10. If she had missed work before due to her back, she could understand the comments and questions, but this never happened. *Id.* at 69:9-14. Further, the comments were not made in a compassionate way, but in an adversarial atmosphere in a very derogatory and demeaning way. *Id.* at 69:15-70:19.

When asked about a specific instance where Bollman made such comments to Plaintiff, Plaintiff testified about a July 2017 bathroom incident. *Id.* at 65:8-67:1; 96:6-13.  Plaintiff also testified that "[j]ust about every time [she] would have an issue" with her back going out "there would be some remark made about was [she] sure [she] was still physically able to do [her] job." *Id.* at 67:12-68:14.

a. <u>July 2017 Bathroom Incident</u>. On July 20, 2017, Bollman's back was out of place. *Id.* at 65:7-67:11. Plaintiff planned to clock out for lunch, use the restroom, and then go to a chiropractor. *Id.* at 65:7-67:11. Plaintiff claims she was trying to load the timeclock application on her computer

but it was taking too long, so she went and used the bathroom while the application was loading. *Id.*
When she came back, Bollman was standing in the doorway and stated that she thought Plaintiff was
out at lunch already and questioned why she had not clocked out before using the restroom. *Id*.
Plaintiff was upset by this and felt demeaned and talked down to. *Id.*

According to her declaration, Bollman had several conversations with Plaintiff about
timekeeping issues in July 2017, but she never mentioned Plaintiff's back condition or back issues
during any of the conversations. Bollman Decl., ¶ 29.

b. <u>Comments Asking Plaintiff if She Was Okay</u>. Plaintiff claims Bollman asked her if she
was okay and whether she could still physically perform her job when her back was out and she was
walking hunched over. Pl. Dep. at 65:1-3, 68:2-5. Plaintiff thought the comments insinuated it was
her "age and [her] back issues." *Id.* at 68:2-7.

According to Plaintiff, when her back would go out, it would cause her to walk bent over
until the chiropractor put it back in place. *Id*. at 67:17-18.  It would sometimes take two or three days
"to get it situated," and it would be very painful in the meantime.  *Id*. at 67:18-68:1. It was an
obvious issue because Plaintiff would walk hunched over.  *Id*. at 92:12-14; 93:5-7. Plaintiff made
no secret about the fact she had a birth defect which would sometimes cause a disk to slip, requiring
a visit to a chiropractor to get it corrected. *Id*. at 93:7-12

Plaintiff did not regularly come to work with her back out of place. *Id*. at 90:20-22. Nor did
Plaintiff ever request an accommodation for this condition. *Id*. at 26:10-12. Plaintiff did not feel she
needed an accommodation because she did not have any medical limitations that affected her ability
to work. *Id*. at 26:13-18.

Bollman only knew that Plaintiff had back problems generally, went to the chiropractor, and would sometimes say her back was out. Bollman Dep. at 55:1-5. Bollman did not know Plaintiff had the specific condition Spondylolisthesis. Bollman Decl., ¶ 30. Bollman never noticed Plaintiff hunching over or walking differently because of her back condition. *Id.* The fact that Plaintiff had back issues did not affect her view of Plaintiff as an employee. Bollman Dep. at 55:6-11.

Bollman has back problems herself and had to have surgery for her back issues so Plaintiff would sometimes discuss those issues with Bollman. *Id.* at 55:6-11; Pl. Dep. at 92:15-22; Bollman Decl., ¶ 30. Bollman told Plaintiff how she injured her back and had to have back surgery. Pl. Dep. at 92:15-22. Plaintiff admits she does not know why Bollman would discriminate against her if she had back issues herself. *Id.* at 92:23-93:1.

Plaintiff never filed a complaint with Human Resources about age or disability discrimination during her employment. *Id.* at 52:16-22. Plaintiff acknowledged reading the employee handbook containing the complaint procedure for PSSI and knew she could go to Human Resources if she had a complaint. *Id.* at 52:9-15. Plaintiff never complained about Yarberry's comments about her age. *Id.* at 17:2-4. Plaintiff understood that PSSI and Lincare did not tolerate age discrimination in the workplace. *Id.* at 52:9-11.

## V. PLAINTIFF'S ADEA CLAIM

### A.    The ADEA

"Under the ADEA, it is unlawful for an employer 'to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Novak v. Chicago Title*

*of Texas, L.L.C.*, 742 Fed. Appx. 5, 7 (5th Cir. 2018) (quoting *Machinchick v. PB Power, Inc.*, 398

F.3d 345, 349–50 (5th Cir. 2005) (quoting 29 U.S.C. § 623(a)(1))). The ADEA does not authorize

a mixed-motive analysis of an age discrimination claim. *Breaux v. Rosemont Realty*, No. CV

14-2265, 2018 WL 3235416, at *6 (W.D. La. July 2, 2018), *aff'd*, 768 Fed. Appx. 275 (5th Cir.

2019). Rather, a plaintiff must prove by either direct or circumstantial evidence that age was the

"but-for" cause of the alleged adverse employment action. *Id.* (citing *Gross v. FBL Financial*

*Services, Inc.*, 557 U.S. 167, 176 (2009) (citations omitted in *Breaux*)). It is insufficient for a plaintiff

to show that age was a motivating factor. *Breaux*, 2018 WL 3235416, at *6 (citing *Gross*, 557 U.S.

at 175). A "but-for" cause is one that without which the challenged adverse employment action

would not have occurred. *Breaux*, 2018 WL 3235416, at *6 (citing *Leal v. McHugh*, 731 F.3d 405,

415 (5th Cir. 2013) (citation omitted in *Breaux*)).

Without direct evidence of discrimination, such as in this case, a plaintiff's circumstantial

evidence is analyzed under the familiar framework established in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973). *Breaux*, 2018 WL 3235416, at *6 (citing *Jackson v. Cal-Western*

*Packing Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (applying *McDonnell Douglas* to ADEA case)).

A plaintiff establishes *a prima facie* case of age discrimination by showing that (1) she was

discharged; (2) she was qualified for the position; (3) she was within the protected class at the time

of discharge; and (4) she was either (i) replaced by someone younger or outside the protected class

or (ii) treated less favorably than similarly situated younger employees. *Novak*, 742 Fed. Appx. at

7 (citing *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015); also citing *Smith*

*v. City of Jackson*, 351 F.3d 183, 196 (5th Cir. 2003), *aff'd on other grounds*, 544 U.S. 228, 125

S.Ct. 1536, 161 L.Ed.2d 410 (2005))).

"If the plaintiff successfully makes out a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination." *Novak*, 742 Fed. Appx. at 7 (quoting *Goudeau*, 793 F.3d at 474). The burden is one of production, not persuasion. *Breaux*, 2018 WL 3235416, at *6 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Novak*, 742 Fed. Appx. at 7 (quoting *Goudeau*, 793 F.3d at 474 (quoting *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015))). "A plaintiff may show pretext 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence."'" *Novak*, 742 Fed. Appx. at 7 (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003))).

The question on the fourth element is whether the plaintiff made a *prima facie* showing that she was fired "because of" her age, "where replacement by someone younger or outside the protected class is just one presumptive form of proof." *Iglesias v. Electrolux Home Care Prod., Ltd.*, No. EP-19-CV-30-KC, 2019 WL 6711476, at *7 (W.D. Tex. Dec. 6, 2019) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004) ("That is, regardless of how much younger his replacement is, a plaintiff in the protected class may still establish a prima facie case by producing evidence that he was discharged because of his age.") (internal quotation mark omitted); also citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("[T]he fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case . . .  rather[,] . . . the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory

criterion.") (internal quotation mark and alterations omitted)).

If the plaintiff's position was eliminated following the termination such that she was not "replaced," a plaintiff can satisfy the fourth element of her *prima facie* case by putting forward evidence that she was "otherwise discharged because of [her] age." *Iglesias*, 2019 WL 6711476, at *7 (quoting *Machinchick*, 398 F.3d at 352–53). A plaintiff may show that he was "otherwise discharged because of his age" by establishing that a comparable employee benefitted from disparate treatment under "nearly identical" circumstances—that is, the two employees "held the same job or responsibilities, shared the same supervisor . . . and have essentially comparable violation histories." *Kim v. Hospira, Inc.*, 709 Fed. Appx. 287, 289 (5th Cir.), *cert. denied*, 138 S. Ct. 2628, 201 L. Ed. 2d 1029 (2018) (citations omitted). The Fifth Circuit has established that alleging age-based disparagement from a supervisor can also satisfy the fourth element of a plaintiff's *prima facie* case. *Iglesias*, 2019 WL 6711476, at *7 (citing *Rachid*, 376 F.3d at 313 ("Evidence in the record demonstrates that [the supervisor] repeatedly made ageist comments to and about [the plaintiff]. . . . Such evidence of discrimination easily establishes a *prima facie* case that [the plaintiff] was 'discharged because of his age.'")).

**B.    Discussion**

**1.    *Prima facie* case**

Here, it is undisputed Plaintiff was terminated, was qualified for her position, and was at least forty years of age when she was terminated.  In its motion for summary judgment, Defendant challenges the fourth element of the *prima facie* case and argues Plaintiff cannot show she was replaced by someone substantially younger or otherwise discharged because of her age. Docket Entry

33

# 23 at p. 18.

In her opposition, Plaintiff does not allege she was replaced by a younger employee or someone outside her protected class. She has also failed to provide evidence of employees with similar violation histories being treated differently than her. Instead, Plaintiff argues the following is sufficient evidence to show she was "otherwise discharged because of her age:" (1) Bollman purportedly told Plaintiff in February 2016 (over eighteen months before her termination) not to consider potential job candidates who were over forty years old; (2) Bollman treated an older employee, Margaret Barrett, poorly and encouraged Plaintiff to encourage her to retire; (3) Bollman purportedly told Shelly Humes, a sales representative who was leaving the company, that Plaintiff was too old for a sales representative position; (4) another employee, Paula Thacker, was over forty and treated similarly to Plaintiff; (5) comments by Bollman and others regarding employees' ages (including comments by Yarberry and Oliver about Plaintiff's age), which created a discriminatory atmosphere. Docket Entry # 24 at pp. 18-21.

Such evidence is of marginal relevance.  However, the Court will assume Plaintiff has established a *prima facie* case of discrimination. The Court continues its analysis under the *McDonnell Douglas* framework and will determine whether Defendant has presented a legitimate, nondiscriminatory reason for terminating Plaintiff.

## 2.    Legitimate, nondiscriminatory reason

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for its treatment of the plaintiff. *McDonnell Douglas,* 411 U.S. at 802. Defendant must set forth, "through

the introduction of admissible evidence, reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (citing *St. Mary's Honor Ctr. v. Hicks*, 590 U.S. 502, 507 (1993), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.* 557 U.S. 167, 169–70, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)). "For a reason to be legitimate and non-discriminatory, the defendant is not required to 'persuade the court that it was actually motivated by the proffered reasons' but must 'clearly set forth, through the introduction of admissible evidence, the reasons for [its decision].'" *Mitchell v. TJX Companies, Inc.*, No. 1:18-CV-82-SA-DAS, 2019 WL 3806369, at *4 (N.D. Miss. Aug. 13, 2019) (quoting Vess v. MTD Consumer Group, Inc., No. 1:16-CV-80-DMB, 2018 WL 934935, *8 (N.D. Miss. Feb. 16, 2018)).

Here, the Court has assumed Plaintiff established a *prima facie* case. Therefore, under the second step in the *McDonnell Douglas* framework, Defendant must put forth a legitimate, nondiscriminatory reason for terminating Plaintiff. Defendant has stated a number of legitimate, nondiscriminatory reasons for terminating Plaintiff's employment: failure to follow workplace instructions regarding time management, failure to meet daily goals including communications, failure to manage compliance binders, failure to train and manage employees, and failure to demonstrate leadership and accountability for her actions, including the use of the office phone for personal business. Plaintiff was put on notice of many of these issues before her termination through counseling and the action plan.

Poor job performance is a legitimate reason for taking an adverse employment action. *See Webster v. Texas Eng'g Extension Serv.*, 204 F.3d 1115, 1999 WL 1328093, at *5 (5th Cir. 1999); *see also Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 96 (5th Cir. 1991). Considering the

35

performance deficiencies set forth in the action plan and further considering the evidence submitted by Defendant revealing Plaintiff's performance did not improve after the action plan, Defendant has met its burden of production.[9]  The legitimate, nondiscriminatory reasons shift the burden back to Plaintiff to show that Defendant discriminated against her because of her age.

## 3.      Pretext

If the defendant produces a sufficient reason for its actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's rationale is pretextual. To show that the employer's rationale is merely a pretext for discrimination, the plaintiff must put forward "substantial evidence" to "rebut[ ] each of the nondiscriminatory reasons the employer articulates." *Tagliabue v. Orkin, L.L.C.*, No. 18-40691, 2019 WL 6833849, at *5 (5th Cir. Dec. 13, 2019) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). "Proof that the defendant's explanation is unworthy of credence . . . may be quite persuasive [circumstantial evidence] . . . [because] [i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Tagliabue*, 2019 WL 6833849, at *5 (quoting *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097).

Evidence demonstrating that the employer's explanation is false or unworthy of credence,

---

[9] The burden on the defendant is one of production, and not of persuasion. The burden of persuasion remains at all times with the plaintiff. *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir.2000).

If the employer meets its burden, "'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non.*'" *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816, 831 (E.D. Tex. 2014) (quoting *Reeves*, 530 U.S. at 142–43 (quoting *Hicks*, 509 U.S. at 510)). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Brooks*, 70 F. Supp. 3d at 831 (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981))) (other citations omitted).

taken together with the plaintiff's *prima facie* case, is "likely to support an inference of discrimination even without further evidence of defendant's true motive." *Tagliabue*, 2019 WL 6833849, at *5 (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). "Thus, the plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Id.* The burden of persuasion remains on Plaintiff to show that Defendant intentionally discriminated against her, which at the pretext stage of the *McDonnell Douglas* analysis under the ADEA requires a showing "that age was [a] 'but-for' cause of the employer's adverse decision." *Tagliabue*, 2019 WL 6833849, at *5 (quoting *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *Burrage v. United States*, 571 U.S. 204, 213, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014))).

In her response, Plaintiff asserts she was given two positive performance evaluations in 2015 and 2016.[10] In March 2017, in an "about face,'"Bollman, the same person who issued [Plaintiff's] two prior outstanding performance evaluations, issued [Plaintiff] a 60 Day Action Plan because of alleged serious concerns with [Plaintiff's] leadership style, ownership/accountability, and how she was communicating with her team." Docket Entry # 24 at p. 22. According to Plaintiff, she "rebuts and discredits all of the complaints Bollman set forth in the 60 Day Action Plan primarily because she was told when Lincare took on new business from competitors, McKesson and Centrad,

---

[10] The Court notes the 2015 and 2016 performance reviews were administered before Jane Carlson alerted Bollman to Plaintiff's performance deficiencies and before the action plan was issued. *See Pearcy v. Miller Brewing Co.*, No. CIV.A. 04-2851, 2006 WL 1030398, at *8 (E.D. La. Apr. 13, 2006) (noting a number of the events referred to in the termination letter occurred after May of 2003 when the performance review was done and further noting the Fifth Circuit has specifically held that "[t]he ADEA does not prohibit termination without warning").

beginning in 2016 and continuing until she was terminated, the new business was to take priority over all of her other job responsibilities including record compliance." *Id.*

Bollman testified the new business and record compliance are both important and a manager must use time management and know when to ask for help in order to do both.  Bollman Dep. at 57:7-23. Plaintiff stated in her deposition that when she was told the "McKesson infusion" was the priority and the binders "took second place," she was also told that she would need to do the binders "when [she] had spare time." Pl. Dep. at 84:7-11.  Plaintiff does not dispute it was her responsibility to keep the binders.  *Id.* at 84:7-9. Nor does she dispute the compliance books were not up-to-date. *Id.* at 61:25-62:2. Moreover, there are numerous other poor performance reasons identified by Defendant as justification for the termination.

If not at the *prima facie* stage, Plaintiff's ADEA claim fails at the pretext stage of the analysis. *See Tagliabue*, 2019 WL 6833849, at *6. Plaintiff has not produced sufficient evidence to establish a genuine fact issue as to whether Defendant's proffered reasons were pretext for discrimination or otherwise that age was the reason for her termination. As noted above, there is no evidence Plaintiff was replaced by a younger employee. Plaintiff has also failed to provide competent summary judgment evidence to demonstrate that she was "otherwise discharged because of age" by establishing that a comparable employee benefitted from disparate treatment under "nearly identical" circumstances.  *See Breaux*, 2018 WL 3235416, at *8.

To the extent Plaintiff points to her own subjective belief that age motivated Bollman or that there was an age bias with the company as a whole, the Court notes an "age discrimination plaintiff's own good faith belief that his age motivated his employer's action is of little value."  *Id.*; *see also*

*Elliott v. Group Medical & Surgical Services*, 714 F.2d 556, 567 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984) (holding the court was "not prepared to hold that a subjective belief of discrimination, however genuine, can be the basis of judicial relief").

Plaintiff points to various age-related remarks as additional circumstantial evidence of Defendant's unlawful discrimination. "Evidence of animus towards a protected group may indicate pretext." *Eyob v. Mitsubishi Caterpillar Forklift Am. Inc.*, No. CV H-16-1688, 2017 WL 3215171, at *8 (S.D. Tex. July 28, 2017), *aff'd*, 745 Fed. Appx. 209 (5th Cir. 2018), as revised (Aug. 10, 2018) (quoting *Spears v. Patterson UTI Drilling Co.*, 337 Fed. Appx. 416, 420 (5th Cir. 2009)). However, "stray remarks" and "comments that are vague and remote in time are insufficient to establish discrimination." *Id.* (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)) (internal quotes omitted). Taking a "cautious view" of the stray remarks doctrine, the Fifth Circuit does not require that the discriminatory remark or remarks to be made in the "direct context of the termination." *Eyob*, 2017 WL 3215171, at *8 (quoting *Cervantez v. KMGP Servs. Co. Inc.*, 349 Fed. Appx. 4, 11 (5th Cir. 2009)). When a discriminatory remark is used as circumstantial evidence of pretext, it is probative of discriminatory intent, but it cannot be used as the sole proof of pretext. *Id.*; *see also Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003).

In evaluating federal discrimination claims, the Fifth Circuit has distinguished between workplace comments presented as direct evidence of discrimination and those presented as additional (*i.e.*, circumstantial) evidence in the course of a *McDonnell Douglas* analysis. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012). Where a plaintiff offers remarks as direct evidence, courts apply a four-part test to determine whether they are sufficient to overcome summary judgment. *Id.* (citing *CSC Logic,* 82 F.3d at 655 (holding that "[r]emarks may serve as sufficient

evidence of age discrimination if the offered comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."); also citing *Laxton v. Gap,* 333 F.3d 572, 583 n. 4 (5th Cir. 2003) (noting that, in light of the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the *CSC Logic* test applies only when a remark is presented as direct evidence of discrimination)).

On the other hand, where a plaintiff offers remarks as circumstantial evidence alongside other alleged discriminatory conduct, courts apply a more flexible two-part test.  *Reed*, 701 F.3d at 441 (citing *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir.2000)). "In that circumstance, a plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Reed*, 701 F.3d at 441 (citing *Laxton,* 333 F.3d at 583 (citing *Russell,* 235 F.3d at 226)).

Here, because the Court finds the statements are circumstantial evidence, the *Reed* test applies. *Harrison v. Chipolbrok Am., Inc.*, No. 4:17-CV-1951, 2019 WL 1755530, at *7 (S.D. Tex. Apr. 19, 2019). Viewing the evidence in the light most favorable to Plaintiff, there is no evidence Yarberry or Oliver were either "primarily responsible for the challenged employment action" or had "influence or leverage over the relevant decisionmaker." *Id*. at *8 (quoting *Reed*, 701 F.3d at 441). Moreover, none of the "snips and barbs" made by Yarberry or Oliver are sufficient to support an inference of discrimination because they do not reflect discriminatory animus based on age.

Plaintiff testified Bollman did not make direct comments about Plaintiff's age. Bollman only

made "very subtle" references to age like "all of us are getting older type of things" and "with age comes certain problems." These general comments do not rise to the requisite level to establish a discriminatory animus. In *Reed*, the Fifth Circuit Court of Appeals concluded that sporadic, age-related comments such as "old man," "old fart," "pops," and "grandpa," which were personally directed toward the plaintiff at various times in the course of his employment, were not sufficient to withstand summary judgment. *Reed*, 701 F.3d at 441.

Bollman also purportedly told Plaintiff not to consider two other employees for a job because they were over forty years old.  The alleged comment occurred in February 2016, approximately eighteen months before Plaintiff's termination. The Court finds this alleged incident is too remote in time with respect to Plaintiff's termination to establish pretext. *Eyob*, 2017 WL 3215171, at *9 (citing *Manaway v. Med. Ctr. of Se. Tex.*, 430 Fed. Appx. 317, 323 (5th Cir. 2011) (holding that a supervisor's threat to send the Ku Klux Klan to an African-American colleague's house, which was made one year prior to the termination and not directed at the plaintiff, was too remote in time to give rise to an inference of pretext); also citing *Lister v. Nat'l Oilwell Varco, L.P.*, No. CIV.A. H-11-01, 2013 WL 5515196, at *19 (S.D. Tex. Sept. 30, 2013) (Rosenthal, J.) (holding that racist comments made at least a year prior to the plaintiffs' terminations, "while tone deaf and offensive," were "too attenuated and too remote in time from the decisions to fire either plaintiff to support an inference of discrimination.")); *see also Cervantez v. KMGP Servs. Co.*, 349 Fed. Appx. 4, 10-11 (5th Cir. 2009) (holding a comment that the defendant "was going to start hiring young people" was not evidence of discrimination because it was the only evidence of pretext and was not made in temporal proximity to the adverse employment action).

"Courts typically only find a statement to be evidence of age discrimination in two situations.

First, courts will find evidence of age discrimination where a statement references age in a derogatory or stereotypical way." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 458 (5th Cir. 2019) (citing *Rachid*, 376 F.3d at 315 (finding evidence of age discrimination where the employer told the plaintiff " . . . you're too old")). "Second, courts will find evidence of age discrimination where the employer's statement shows a desire to replace older employees with younger ones." *McMichael*, 934 F.3d at 458 (citing *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577–78 (5th Cir. 2003) (finding sufficient evidence to sustain a jury verdict where the employer stated that the plaintiff's "sales techniques were out of the 'old school' of selling"; commented that "there was a 'graying of the sales force'" and the employer needed "to find a way to get through it;" and recommended severance packages for fourteen named employees, all of whom were specifically identified as over fifty years of age, to create "the flexibility to bring on some new players")). Neither situation was present in *McMichael*.  934 F.3d at 458 ("Commenting on McMichael's eligibility for retirement does not reference age in a derogatory or stereotypical way. Nor does it show a desire to replace older employees with younger ones. It also does not imply that McMichael's age was the reason he was fired, especially in the context of a reduction in force.").

Neither of those situations are present in this case.  In addition to the above stray comments, Plaintiff alleges Bollman said she hoped Margaret Barrett would retire and told her to "pick up the pace."[11]  As noted in *McMichael*, commenting on retirement is not by itself indicative of discriminatory intent. *McMichael*, 934 F.3d at 458; *see also Moore v. Eli Lilly & Co.*, 990 F.2d 812, 818 (5th Cir. 1993), *cert. denied* 510 U.S. 976 (1993) (holding that an employer's inquiry into an

---

[11] In her deposition, Plaintiff admitted Barrett struggled to perform. Pl. Dep. at 72:22-73:8.  Bollman explains in her declaration she frequently directs employees of all ages to "pick up the pace" when performing various tasks because Defendant is now a "numbers-driven business" owned by Lincare.  Bollman Decl., ¶ 28.

employee's age and retirement plans is not by itself evidence of discriminatory intent). Courts have also held that comments about "working faster" or retirement made to employees are stray remarks and not evidence of discrimination. *See Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993) (holding that supervisor's remark that a younger person could do faster work and reference to the plaintiff as an "old fart" were stray remarks, insufficient to create a genuine issue of material fact regarding age or age-based discrimination).

Plaintiff's remaining allegations of pretext or attempts to show Defendant's discriminatory animus (i.e., that Bollman purportedly told Shelly Humes Plaintiff was too old to be a sales representative and Defendant's treatment of Paula Thacker) are equally insufficient to defeat summary judgment. Considering all the alleged comments collectively and viewing all the evidence in the light most favorable to Plaintiff, no evidence shows that age was a factor in Bollman's decision to terminate Plaintiff's employment.

A plaintiff must present enough competent summary judgment evidence to raise a genuine issue of fact. A mere scintilla of evidence of pretext is not enough. *Breaux*, 2018 WL 3235416, at *6 (citing *Anderson v. Tupelo Regional Airport Auth.*, 568 Fed. Appx. 287, 290 (5th Cir. 2014)). Viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff failed to provide sufficient evidence on which a reasonable trier of fact could find that Defendant's proffered reasons are pretexts or that Defendant's explanation is not credible. *Little*, 924 F.2d at 96. Plaintiff has not shown that "but for" her age her employment would not have been terminated. Therefore, the Court recommends this part of the motion for summary judgment be granted.

## VI. PLAINTIFF'S ADA CLAIM

### A.      Applicable law

In her complaint, Plaintiff also alleges Defendant discriminated against her in violation of the Americans with Disabilities Act of 1990. To establish a *prima facie* case for disability discrimination under the ADA, a plaintiff must establish the following: (1) he suffers from a disability; (2) he is qualified for the job despite the disability; (3) he was subjected to an adverse employment action due to the disability; and (4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *Thomas v. Beaumont Indep. Sch. Dist.*, 166 F. Supp. 3d 714, 733–34 (E.D. Tex.), *aff'd*, 627 Fed. Appx. 332 (5th Cir. 2015) (citing *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279–80 (5th Cir.2000)). To have a qualifying disability, a plaintiff must demonstrate "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Thomas*, 166 F. Supp. 3d at 734 (quoting *Hale v. King*, 642 F.3d 492, 499–500 (5th Cir.2011)).

A plaintiff may establish a claim of discrimination under the ADA either by presenting direct evidence or by using the indirect method of proof set forth in *McDonnell Douglas*.  *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999).  The *prima facie* case, once established, raises a presumption of discrimination which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its action. *Radcliff v. Wal-Mart Stores, Inc.*, 2002 WL 1042116, at \*4 (N.D. Tex. May 21, 2002)(unreported).  The plaintiff ultimately bears the burden of showing the employer's actions were motivated by considerations prohibited by the statute.  *Seaman*, 179 F.3d

at 300.

Plaintiffs who claim employment discrimination must exhaust administrative remedies—by timely filing a charge with the EEOC and ultimately receiving a "right to sue" letter—prior to filing suit in federal court. *Iglesias v. Electrolux Home Care Prod., Ltd.*, No. EP-19-CV-30-KC, 2019 WL 6711476, at *4 (W.D. Tex. Dec. 6, 2019) (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 377–78 (5th Cir. 2002)). Because most EEOC charges are filed *pro se* by laypersons, the scope of a charge is construed liberally. *Iglesias*, 2019 WL 6711476, at *4 (citing *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006)). To this end, Fifth Circuit courts evaluate exhaustion based on the hypothetical scope of the EEOC investigation that could reasonably be expected to grow out of the plaintiff's charge of discrimination, not solely the scope of the charge itself. *Iglesias*, 2019 WL 6711476, at *4 (citing *Pacheco*, 448 F.3d at 789). This requires a "fact-intensive analysis of the statement given by the plaintiff . . . look[ing] slightly beyond its four corners, to its substance rather than its label." *Id.*

## B.    Discussion

Defendant first asserts Plaintiff's disability discrimination claim should be dismissed because she did not exhaust her administrative remedies. Under the ADA "[n]o action . . . shall be brought . . . if administrative remedies have not been exhausted." *Thomas*, 166 F. Supp. 3d at 733 (quoting 42 U.S.C. § 6104(e)(2)). In addition, the ADA incorporates the administrative prerequisites of Title VII, and thus an ADA charge must be verified. *Howard v. Vantage Int'l Mgmt., LLC*, No. 4:18-CV-4182, 2019 WL 2492866, at *2 (S.D. Tex. May 21, 2019), *report and recommendation adopted*, No. 4:18-CV-4182, 2019 WL 2491897 (S.D. Tex. June 13, 2019) (citing *Dao v. Auchan*

*Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996) (citing 42 U.S.C. § 12117(a); *Edelman v. Lynchburg College*, 535 U.S. 106, 118 (2002) (citing 42 U.S.C. § 2000e-5(b) for requirement to swear that allegations in charge are true)).

Plaintiff does not assert in her EEOC Charge of Discrimination that Defendant discriminated against her based on disability. Pl. Ex. 1. She only checked the boxes for retaliation and age discrimination, not disability discrimination. *Id.* In describing the "particulars," Plaintiff stated she was ridiculed publicly by Bollman on July 20, 2017 "for not clocking out before going to the restroom because of [her] back issues." *Id.* In her "discrimination statement," Plaintiff stated she believed she "was discriminated against before of [her] age (60), in violation of the Age Discrimination in employment Act of 1967, and that [she] was retaliated against." *Id.* As pointed out by Defendant, the Charge of Discrimination is not signed or dated.  Docket Entry # 23 at p. 26, n. 22.

In *Iglesias*, the defendant argued the plaintiff's statements to the EEOC concerned only discrimination by age-based termination. *Iglesias*, 2019 WL 6711476, at *5.  Because the EEOC charge did not contain any of the facts underlying the plaintiff's retaliation or hostile work environment claims, the defendant argued those claims had not been exhausted. *Id.* On her EEOC charge and intake questionnaire, when identifying the basis of the alleged discrimination, the plaintiff checked only the "age" boxes, not "retaliation." *Id.*

According to the court, the check boxes are not dispositive because the "crucial element" of an EEOC charge is its factual statement. *Id.* (quoting *Melgar v. T.B. Butler Publ'g Co.*, 931 F.3d 375, 379 (5th Cir. 2019) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir.

1970))). The court noted the plaintiff had submitted the following factual statement on her handwritten intake questionnaire: "[F]ired because of my age. Electrolux lied that they were having a reduction in force so laid off about 12 employees. However as to my position, Quality Inspector, I was immediately replaced by Nora Diaz, who is about 30 years younger than me, with much less experience than me." *Iglesias*, 2019 WL 6711476, at *5.

The plaintiff argued the retaliation and hostile work environment claims – not contained in the above factual statement but subsequently detailed in the complaint, were still "effectively exhausted because any resulting EEOC investigation would reasonably be expected to discover those facts." *Iglesias*, 2019 WL 6711476, at *5. Although the court agreed with the plaintiff "that, in theory, an EEOC charge detailing a discriminatory termination could contain facts which serve to exhaust a retaliation or hostile work environment claim as well," the court stated the plaintiff's "relatively bare statement of facts to the EEOC contain[ed] no indication of protected conduct engaged in or harassment experienced which would lead to an investigation of either claim, respectively." *Id.* (citing *Gates v. Lyondell Petrochemical Co.*, 227 Fed. Appx. 409, 409 (5th Cir. 2007) (finding a hostile environment claim "could not be expected to grow out of [the plaintiff's] EEOC discrimination charge when she charged only her employer's discrete acts in termination and failing to promote her, and made no mention of a hostile work environment"); also citing *Garrett v. Judson Indep. Sch. Dist.*, 299 Fed. Appx. 337, 344 (5th Cir. 2008) (finding that the plaintiff exhausted her retaliation claim before the EEOC, but that "[a]ge discrimination is a 'separate and distinct' claim of employment discrimination") (quoting *Randel v. U.S. Dep't of Navy*, 157 F.3d 392, 395 (5th Cir. 1998))).

The plaintiff asserted an investigation of her alleged discriminatory termination would cover

47

the "circumstances" of that termination, including any internal complaints that Plaintiff filed or harassment that occurred. *Iglesias*, 2019 WL 6711476, at *5. Again, although the court stated this "theory could very well prevail on a more factually robust EEOC charge," the court stated that "without any facts in the Charge even intimating the existence of retaliation and hostile environment claims, Plaintiff's argument effectively collapse[d] the three distinct claims into one for exhaustion purposes, which cannot be squared with Fifth Circuit precedent." *Id.* According to the court, the Fifth Circuit has explained:

> [F]ailure to check the appropriate box is not fatal to [the plaintiff's] retaliation claim . . . but [the plaintiff's] description of his charge in the particulars section described only a discrimination claim. . . . Discrimination and retaliation claims are distinct, and the factual statement in [the plaintiff's] EEOC charge did not put [the employer] on notice that [the plaintiff] was asserting a retaliation claim.

*Iglesias*, 2019 WL 6711476, at *5-6 (quoting *Frazier v. Sabine River Auth. La.*, 509 Fed. Appx. 370, 373–74 (5th Cir. 2013); also citing *Stith v. Perot Sys. Corp.*, 122 Fed. Appx. 115, 118 (5th Cir. 2005) (finding hostile environment claim non-exhausted within age discrimination charge because "[n]owhere in the narrative of [the plaintiff's] EEOC charge is anything other than the alleged discrete acts of discrimination . . . even mentioned")). The court in *Iglesias* concluded the plaintiff failed to exhaust her retaliation and hostile work environment claims prior to filing suit and granted the defendant summary judgment on those claims. *Iglesias*, 2019 WL 6711476, at *6.

Here, Plaintiff did not check the disability box on her Charge of Discrimination or state in the body of the Charge that her employment was terminated because of an alleged disability. Instead, she noted only that she was ridiculed for not clocking out before going to the bathroom because of her back issues. According to Defendant, Plaintiff did mention disability discrimination in her intake

48

questionnaire. Docket Entry # 23 at p. 26.  Defendant asserts this does not excuse Plaintiff from

having to assert disability discrimination in a verified charge.  *Id.*

In *Howard*, a court in this circuit recently considered whether an unverified intake

questionnaire qualifies as an ADA charge, and also whether a later verified charge can relate back

to the filing of the intake questionnaire. *Howard*, 2019 WL 2492866, at *3.  According to the court,

the Fifth Circuit has held that because an ADA charge must be verified, an unverified intake

questionnaire alone cannot be deemed a charge under the ADA.[12] *Id.* (citing *Patton v. Jacobs Eng'g

Group, Inc.*, 874 F.3d 437, 443 (5th Cir. 2017)). The issue in *Patton* was not the timeliness of his

charge, but whether the scope of the charge included the plaintiff's failure to accommodate claim

as well as his harassment claim. *Howard*, 2019 WL 2492866, at *3 (citing *Patton*, 874 F.3d at 441).

The Fifth Circuit held the intake questionnaire should be construed "as part of the EEOC charge,"

and because Patton's intake questionnaire and charge "trigger[ed] the investigatory and conciliatory

procedures of the EEOC," as to all of Patton's claims, his charge was sufficient to exhaust his

administrative remedies. *Howard*, 2019 WL 2492866, at *3 (citing *Patton*, 874 F.3d at 443-44).

The Court notes Plaintiff has not addressed the intake questionnaire or attached it for the

Court's review.  Even if the intake questionnaire should be considered part of Plaintiff's formal

Charge of Discrimination so that a claim of disability discrimination could reasonably be expected

to – and in fact did – grow out of the Charge of Discrimination, the issue of whether the Charge of

Discrimination is properly verified remains. Plaintiff testified she does not remember whether she

---

[12] The court in *Howard* concluded an unverified intake questionnaire may constitute a timely ADA charge if it is sufficiently detailed, requests agency action, and is supplemented by a verified charge. *Howard*, 2019 WL 2492866, at *4.

signed the EEOC Charge.  Pl. Dep. at 11:24-12:7 (stating she dealt with the EEOC over the phone "quite a bit" and does not specifically remember signing the Charge).

Another court in this circuit has held the ADA does not require verification. *Jones v. Sewerage & Water Bd. of New Orleans*, No. CV 17-8076, 2018 WL 4909911, at *4 (E.D. La. Oct. 10, 2018) (citing 29 U.S.C. § 626(d); 29 CFR § 1626). According to the court in *Jones*, a plaintiff is not necessarily barred from bringing suit on a charge that is unsigned or unverified. *Jones*, 2018 WL 4909911, at *4 (citing *Ragland v. Dallas Cty. Cmty. Coll. Dist.*, No. 3:16-CV-722-L, 2017 WL 1196863, at *4 (N.D. Tex. Mar. 31, 2017)). The court noted the EEOC may waive the requirement that a charge be signed and verified. *Jones*, 2018 WL 4909911, at *4 (citing *Crawford v. Harris Cty. Juvenile Prob. Dep't*, 31 Fed. Appx. 159 n.6 (5th Cir. 2001) (internal citations omitted)). The court further noted a "charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Jones*, 2018 WL 4909911, at *4 (quoting 29 C.F.R. § 1601.12(b)).

In *Jones*, there was no dispute the plaintiff filed a timely charge with the EEOC and received a statutory notice of right to sue before filing the lawsuit. *Jones*, 2018 WL 4909911, at *4. The issue was whether the plaintiff's unsigned charge of discrimination was sufficient to exhaust administrative remedies prior to the commencement of litigation in federal court. *Id*. Following the reasoning of *Price* and the language of 29 C.F.R. § 1601.12(b), the court in *Jones* found the plaintiff exhausted administrative remedies before filing suit in federal court. *Id.* According to the court, the plaintiff's charge was sufficiently precise to identify the parties and describe generally the action or practices of which the plaintiff complained. *Id.*

50

Here, Plaintiff received a statutory notice of right to sue before filing this lawsuit. The Court will assume in this instance Plaintiff properly exhausted her administrative remedies under the ADA. Even with this assumption, the ADA claim still fails as a matter of law, because Plaintiff has not presented sufficient evidence to create a genuine issue of material fact on each element of this cause of action. *Thomas*, 166 F. Supp. 3d at 733. The ADA's definition of disability permits suits by plaintiffs who, "though not actually disabled per se are nonetheless regarded as having such an impairment." *Kemp v. Holder*, 610 F.3d 231, 23 6–37 (5th Cir.2010) (internal quotations and citations omitted). However, a party is regarded as having such an impairment, if the party can show that (1) an employer mistakenly believes that the employee has an impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *Id.* at 237. "[B]oth of these showings require that the plaintiff demonstrate that the employer actually entertain[ed] misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* (internal citations and quotations omitted).

Here, Plaintiff argues Bollman regarded her as having a disabling impairment and unable to perform the functions of her job based on comments made about whether she was physically able to do her job. Plaintiff asserts Bollman and Yarberry would ask her if she was physically able to still do her job any time Plaintiff was having a back episode, despite the fact Plaintiff never missed work because of her back condition.  Docket Entry # 24 at p. 16. Plaintiff testified as to one specific instance a month before she was terminated when Bollman made Plaintiff feel "substandard because of her back." *Id*. at p. 17. This is the so-called July 20, 2017 bathroom incident.

To establish she was fired as a result of a perceived "substantial limitation," Plaintiff must produce evidence that Bollman regarded her as being "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kemp,* 610 F.3d at 237.  When "the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. . . . 'The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

There is no evidence in the record from which a jury could find Bollman or Defendant actually entertained misperceptions about Plaintiff's "substantial limitation" in major life activities. "Nothing in the record supports the notion" that Bollman or Defendant believed Plaintiff to be significantly restricted in her ability to do her job. Viewing all of the above evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has failed to produce evidence of "a physical or mental impairment that substantially limits one or more [of her] major life activities" or that she was "regarded as having such an impairment." *Kemp*, 610 F.3d at 239. Thus, Defendant did not regard Plaintiff as being disabled.

As discussed in detail above, even if Plaintiff was able to show a *prima facie* case, her claim still fails because she cannot show Defendant's legitimate, nondiscriminatory reasons for her termination are pretext. The Court recommends Plaintiff's ADA claim be dismissed.

## VII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry # 23) be **GRANTED**.  It is further

**RECOMMENDED** that Plaintiff's above-entitled and numbered cause of action be **DISMISSED WITH PREJUDICE**

### Objections

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1)

(extending the time to file objections from ten to fourteen days).

**SIGNED this 3rd day of February, 2020.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE